John J. Tomaselli
TOMASELLI & CO.
110 Wall Street
11th Floor, No. 68
New York, New York 10005
Tel: (212) 461-4880
Fax: (212) 214-0318

ATTORNEYS FOR PLAINTIFF
COSCOL (HK) INVESTMENT & DEVELOPMENT CO., LTD.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| COSCOL (HK) INVESTMENT & DEVELOPMENT CO., LTD., <br><br> Plaintiff, <br><br> -against- <br><br> ESCOPETA OIL & GAS CORPORATION, <br><br> Defendant. | 08 Civ. 0864 - DC <br><br> **VERIFIED FIRST AMENDED COMPLAINT** |

Plaintiff, COSCOL (HK) Investment & Development Co., Ltd. ("Plaintiff" or "COSCOL"), by and through its attorneys, Tomaselli & Co., for its verified first amended complaint against Escopeta Oil & Gas Corp. ("Defendant" or "Escopeta"), alleges, upon information and belief, as follows:

1.      This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333 as hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

2.      At all times material herein, plaintiff COSCOL was and is a business entity organized and existing under the laws of the Hong Kong Special Administrative Region of the

People's Republic of China with a place of business at Room 4002, 40/F, COSCO Tower, 1B3 Queen's Road Central, Hong Kong.

3.    Upon information and belief, at all times material herein, Escopeta is a business entity having a place of business located at 5005 Riverway, Suite 440, Houston, Texas 77058.

4.    In February 2006, COSCOL and Escopeta entered into a voyage charter party whereby Escopeta chartered the semi-submersible vessel *TAI AN KOU* (the "Vessel") to Escopeta under a HEAVYCON charter party form for a voyage from one safe and suitable loading location, Sabine Pass, USA, to one safe and suitable discharging location, Cooks Inlet, USA (the "Charter").  A true and correct copy of the Charter is annexed as Exhibit 1.

5.    The Charter provided that COSCOL would be paid $4,310,000.00 in freight for transporting the vessel *TELLUS* on the Vessel, which is a heavy lift vessel.

6.    On April 7, 2006, COSCOL and Escopeta entered into Addendum #1 of the Charter, which amended the routing of the Vessel and increased the freight payable to COSCOL to $4,710,000.00.  A true and correct copy of Addendum #1 is annexed as Exhibit 2.

7.    In June 2006, COSCOL presented the Vessel to Escopeta in accordance with the Charter.  The Vessel stood by awaiting instructions from Escopeta for five days until Escopeta expressly discharged the Vessel because the *TELLUS* was not ready.

8.    Clause 20.2 of Part II of the Charter provides Escopeta the right to cancel performance under the Charter by paying COSCOL a termination fee specified in the Charter. Rather than terminate the Charter, however, Escopeta renegotiated the terms of the Charter to have the Vessel return to perform the requested carriage of the *TELLUS* later in 2006.

9.    Escopeta subsequently requested that COSCOL make the Vessel available during the *TELLUS*' next loading window.  COSCOL agreed to do so on the condition that Escopeta

2

enter another addendum, to which condition Escopeta agreed. Addendum #4 to the Charter, reflecting these changes, was executed on July 21, 2006. Addendum #4 provided that Escopeta would pay between $4,779,000.00 and $5,179,000.00 (depending upon the ultimate route selected) without regard to whether the freight actually was carried. A true and correct copy of Addendum #4 is annexed as Exhibit 3.

10.      Escopeta once again requested that COSCOL agree to a revision of the Charter because the TELLUS would not be ready during the agreed loading window. On or about October 11, 2006, Addendum #5 to the Charter was executed between COSCOL and Escopeta. A true and correct copy of Addendum #5 is annexed as Exhibit 4. Addendum #5 to the Charter provides:

> The total amount due paid in full by Charterers [Escopeta] to Owners [COSCOL] by October 20, 2006 is USD 4,915,875.00  If the total amount is not paid by October 20, 2006, Owners have the option to terminate the Contract [Charter].

Addendum #5, Paragraph 5. The payment provided in paragraph 5 of Addendum #5 covered damages suffered by COSCOL resulting from the previous delays, and was in addition to freight to be paid to COSCOL for carrying the *TELLUS*.

11.      COSCOL has performed its obligations under the Charter and under Addendum #5. Escopeta, however, has refused to pay the $4,915,875.00 as required by Addendum #5, despite Escopeta's admission that it owes COSCOL this amount.

12.      Indeed, Escopeta has brought an indemnification claim against its contractual partner(s) Songa Management, Inc. Songa Drilling AS, Songa Drilling Pte Ltd. and Songa Offshore ASA (collectively "Songa") for the amounts that Escopeta owes COSCOL under the Charter and its Addendum #5, which claims Escopeta filed in Texas state court against Songa in

a matter entitled *Escopeta Oil & Gas Corporation v. Songa Management, Inc. et al., Cause No. E-177,288* (the "Texas Proceeding").

13.    COSCOL intervened into the Texas Proceeding in order to preserve its claims against Escopeta.

14.    COSCOL intervened in the Texas Proceeding because, amongst other reasons, COSCOL has determined through investigation that Escopeta appears to have no other assets to its name other than the claim that it possesses against Songa.

15.    As part of the Texas Proceeding, COSCOL, Escopeta and Songa participated in mediation, as a result of which Escopeta and Songa have reached a settlement agreement on Escopeta's claims, by the terms of which settlement Songa and/or its affiliates and/or paying agents will be effecting payment to Escopeta and/or to its payment agents for the benefit of Escopeta within the next few weeks.

16.    Upon information and belief, the payment of these settlement funds for the benefit of Escopeta will be made by one or more of the following Songa entities:

    a.    Songa Management, Inc.;

    b.    Songa Drilling AS a/k/a Songa Drilling ASA, now known as KCA Deutage Offshore AS a/k/a KCA Deutage Offshore ASA;

    c.    Songa Drilling Pte Ltd., now known as KCA Deutage Pte Ltd.;

    d.    Songa Offshore ASA a/k/a Songa Offshore AS; and/or

    d.    the Abbott Group, plc.

17.    Upon information and belief, the payment of these settlement funds to Escopeta will be made to one or more of the following entities as payment agents for the benefit of Escopeta:

    a.       Escopeta Oil & Gas Corporation;

    b.       Joseph F. Archer, P.C. or Joe Archer or Joseph F. Archer, P.C. IOLTA Account (counsel for Escopeta);

    c.       Mehaffy Weber, P.C. or Mehaffy Weber, P.C. IOLTA Account (counsel for Escopeta);

    d.       Ernest W. Boyd or Butch Boyd or Ernest W. Boyd IOLTA Account (counsel for Escopeta);

    e.       Chamberlain, Hrdlicka, White, Williams & Martin, P.C. or Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA (counsel for Songa);

    f.       Lyman, Twining, Weinberg & Ferrell, P.C. or Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account (counsel for Songa)

    g.       Daniel S. Davis (aka Danny Davis); and/or

    h.       Centurion Gold Holdings, Inc.

18.      As a result of Escopeta's breaches of the Charter and its addenda, COSCOL has suffered damages in the amount of $4,915,875.00.

19.      Upon information and belief, two years time will have passed between the time when Escopeta breached the Charter and the time when COSCOL will prosecute this claim against Escopeta to its completion.  Part I, Clause 27 and Part II, Clause 32 of the Charter provide that the Charter is governed by English law.  Under English law and London arbitration (as called for in the underlying charter party), COSCOL is entitled to receive its interest, expenses and reasonable attorneys' fees for prosecuting its claims to completion.  The estimated amount of interest (calculated at the contractual rate of 18% per annum) and attorneys' fees is estimated to be $2,019,715.00 as set forth below:

Interest:                                $1,769,715.00 ($4.9 million x 0.18/year x 2 yrs.)
Attorneys' Fees/Expenses:      $   250,000.00

Total:                                   $2,019,715.00

20.     Therefore, as a result of the foregoing and Escopeta's breach of its obligations under the Charter, COSCOL has suffered damages in the amount of **$6,935,590.00**, including estimated interest, attorneys' fees and expenses.

21.     Upon information and belief, Escopeta is not found within the Southern District of New York but does have assets, good or chattels that are or will be located within the jurisdiction, including but not limited to the aforementioned settlement proceeds from the settlement of the dispute between Escopeta and Songa, including but not limited to such funds situated in the bank account(s) of or being routed to the defendant Escopeta Oil & Gas Corporation and/or parties who are acting as the paying and/or payment agents for Escopeta and/or are sending and/or receiving funds for the benefit of defendant Escopeta, including but not limited to: (a) Songa Management, Inc.; (b) Songa Drilling AS; (c) Songa Drilling ASA; (d) KCA Deutage Offshore AS; (e) KCA Deutage Offshore ASA; (f) Songa Drilling Pte Ltd.; (g) KCA Deutage Pte Ltd.; (h) Songa Offshore ASA; (i) Songa Offshore AS; (j) Abbott Group, plc.; (k) Joseph F. Archer, P.C.; (l) Joe Archer; (m) Joseph F. Archer, P.C. IOLTA Account; (n) Mehaffy Weber, P.C.; (o) Mehaffy Weber, P.C. IOLTA Account; (p) Ernest W. Boyd; (q) Butch Boyd; (r) Ernest W. Boyd IOLTA Account; (s) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. (t) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA Account; (u) Lyman, Twining, Weinberg & Ferrell, P.C.; (v) Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account; (w) Daniel S. Davis (aka Danny Davis); and/or (x) Centurion Gold Holdings, Inc.

22.    Upon information and belief, the assets, goods or chattels referenced in the preceding paragraph are located at the following financial institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

**WHEREFORE**, plaintiff COSCOL (HK) Investment & Development Co., Ltd. prays:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Escopeta Oil & Gas Corporation with the financial institutions noted above in paragraph 22;

2.    That if defendant Escopeta Oil & Gas Corporation cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant Escopeta Oil & Gas Corporation up to and including the sum of $6,935,590.00 may be restrained and attached, including but not limited to cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant Escopeta Oil & Gas Corporation including but not limited to such assets as may be held, received or transferred in its own name or as may

be held, received or transferred for its benefit by the entities who act as its paying/payment agent(s), namely: (a) Songa Management, Inc.; (b) Songa Drilling AS; (c) Songa Drilling ASA; (d) KCA Deutage Offshore AS; (e) KCA Deutage Offshore ASA; (f) Songa Drilling Pte Ltd.; (g) KCA Deutage Pte Ltd.; (h) Songa Offshore ASA; (i) Songa Offshore AS; (j) Abbott Group, plc.; (k) Joseph F. Archer, P.C.; (l) Joe Archer; (m) Joseph F. Archer, P.C. IOLTA Account; (n) Mehaffy Weber, P.C.; (o) Mehaffy Weber, P.C. IOLTA Account; (p) Ernest W. Boyd; (q) Butch Boyd; (r) Ernest W. Boyd IOLTA Account; (s) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. (t) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA Account; (u) Lyman, Twining, Weinberg & Ferrell, P.C.,; (v) Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account; (w) Danny Davis; and/or (x) Centurion Gold Holdings, Inc., at one or more of the following institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York;

      3.      That Escopeta Oil & Gas Corporation and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

      4.      That judgment be entered in favor of COSCOL (HK) Investment & Development

Co., Ltd. and against Escopeta Oil & Gas Corporation in the amount of $6,935,590.00 (including

estimated interest, expenses and attorneys' fees); and,


5.    That this Court grant COSCOL (HK) Investment & Development Co., Ltd. such

other and further relief which it may deem just and proper.


Dated: New York, New York
       February 26, 2008

                          TOMASELLI & CO.


                     By: /s/ John J. Tomaselli
                         John J. Tomaselli
                         110 Wall Street
                         11th Floor, No. 68
                         New York, New York 10005
                         Tel: (212) 461-4880
                         Fax: (212) 214-0318
                         *Attorneys for Plaintiff*
                         *COSCOL (HK) Investment & Development Co., Ltd.*

## VERIFICATION

STATE OF FLORIDA                 )

                                 :ss.:

COUNTY OF BROWARD                )

JOHN J. TOMASELLI, being duly sworn, deposes and says:

I am a member of the firm of Tomaselli & Co., counsel for COSCOL (HK) Investment & Development Co., Ltd., plaintiff in the foregoing action. I have read the foregoing Verified First Amended Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by COSCOL (HK) Investment & Development Co., Ltd. and corresponded with COSCOL (HK) Investment & Development Co., Ltd. representatives regarding this matter. I am authorized by COSCOL (HK) Investment & Development Co., Ltd. to make this verification, and the reason for my making it as opposed to an officer or director of COSCOL (HK) Investment & Development Co., Ltd. is that there are none within the jurisdiction of this Honorable Court.

_____
                                John J. Tomaselli

Sworn to before me this
26th day of February, 2008

Fazia Assad
My Commission DD346058
Expires August 31, 2008

_____
Notary Public

# EXHIBIT 1

| 1. Place and date of Contract | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL |
|---|---|
| Contract #2219 dated 9th February 2006 Houston, TX USA | STANDARD TRANSPORTATION CONTRACT FOR HEAVY AND VOLUMINOUS CARGOES |
| | CODE NAME: "HEAVYCON" PART I |

| 2. Owners/place of business (Cl. 2.1.) | 3. Charterers/place of business (Cl. 2.1.) |
|---|---|
| COSCOL (HK) Investment & Development Co., Limited Room 4002, 40/F, COSCO Tower, 183 Queen's Road Central Hong, Kong | Escopeta Oil & Gas Corporation 5005 Riverway, Suite 440 Houston, Texas 77056 |
| Owners Agents/Place of Business NMA Maritime & Offshore Contractors B.V. Strevelsweg 700, zpp. 503/ 509 3083 AS Rotterdam The Netherlands | |

| 4. Vessel (name, type and other particulars; also description of Owners' equipment) (Cl. 2.1. & 4.2.) |
|---|
| COSCO semi-submersible vessel "Tai Aa Kou" – See Appendix II |

| 5. Cargo (full description of cargo; indicate whether full and complete cargo or part cargo; also state minimum/maximum weight of cargo) (Cl. 2.1. & 16.4.) |
|---|
| Songa Tellus MLT 82 SGC Jack Up Rig, always within vessel's capabilities and capacity. Subject cargo details |

| 6. Loading port(s) (Cl. 2.1.) | 7. Discharging port(s) and intended route from loading port to discharging port (Cl. 2.1. & 3.2.) |
|---|---|
| Sabine Pass, USA | Cooks Inlet, USA |
| 1 safe and suitable loading location to be arranged by Charterers | 1 safe and suitable discharging location to be arranged by Charterers |

| 8. Loading method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.3.) | 9. Discharging method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.6.) |
|---|---|
| 4.3 ( c ) Float-On | 4.6 ( c ) Float-Off |

| 10. First laytay (Cl. 6.1.) | 11. Cancelling date (Cl. 6.1.) |
|---|---|
| Loading Window 1 -30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning | 30th June 2006 |

| 12. Notices for loading to be given to (Cl. 5.1. & 9.2.) | 13. Notices for discharging (state interval periods and to whom to be given) (Cl. 9.2. & 9.3.) |
|---|---|
| Owners to give Charterers 14/7/3/1 days approximate load readiness notice | Owners to give Charterers 14/7/3/1 days approximate discharge readiness notice |

| 14. Marine Surveyor(s) and date for transportation approval (Cl. 10.1. & 10.4.) |
|---|
| To be nominated by Charterers - Approval within 21 days of Owner's tendering notice of readiness |

| 15. Freight (Cl. 11.) | 16. Freight and demurrage, etc. payment (currency and where payable; also state owners' bank account) (Cl. 11.) |
|---|---|
| U.S. $4,310,900.00 | Payment of freight and demurrage as per Clause 11, 12, and 33. |
| | Payments made to: |
| | Rabobank Zeist, 2e Hogeweg 83, 3701 AW Zeist, The Netherlands |
| | Swiftcode: RABONL2U |
| | Account No: 15.90.82900 |
| | In Name of: |
| | NMA Maritime & Offshore Contractors BV |

| 17. Free time for loading/discharging and canal transit (if applicable) (state total number of running hours) (Cl. 12.1. & 14.1.) |
|---|
| 24 hours loading SHINC/FHINC |
| 24 hours discharging SHINC/FHINC |

| 18. Demurrage rate per day (Cl. 12.2.) |
|---|
| USD 25,000 per day pro rata in port |
| USD 30,000 per day pro rata offshore standby |
| USD 40,000 per day pro rata deviation |

| 19. Mobilisation charge (if agreed, state lump sum amount) (Cl. 13.1.) | 20. Demobilisation charge (if agreed, state lump sum amount) (Cl. 13.2.) |
|---|---|
| N/A | N/A |

| 21. Canal transit costs (if any) limited to (Cl. 14.2.) | 22. Price per ton of bunker oil (Cl. 15) |
|---|---|
| N/A | USD 300 mt IFO 380 |

EXHIBIT A

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or addition to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO)

ESCOPEIA_0005681

(continued)                    CON...NDARD CONTRACT FOR HEAVY AND VOLUMIN... ...RGOES                    PART I

| 23. Termination Fee(s) (state amount(s) if agreed) (Cl. 20.1 & 20.2.)<br><br>75% of the Freight in Box 15 | 24. Liability for cargo (state whether Bill of Lading or Cargo Receipt) (Cl. 21.4. or Cl. 21.5.)<br><br>Cargo Receipt |
| | 25. General average shall be adjusted/settled at (Cl. 26)<br><br>LONDON |
| 26. Brokerage and to whom payable (Cl. 31) | 27. Law and arbitration (state 32.1., 32.2. or 32.3. of Cl. 32. as agreed; if 32.3. agreed state place of arbitration) (if Box 27 not filled in 32.1. shall apply) (Cl. 32)<br><br>English Law<br><br>Arbitration in London |
| 28. Numbers of additional clauses covering special provisions, if agreed<br><br>Clauses 33, 34, 35, 36, 37,38 and Appendices I, II, III and IV form an integral part of the charter party. | |

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Contract consisting of PART I including additional clauses, if any agreed and stated in Box 28 and PART II. In the event of a conflict of conditions, the provisions of PART I and any additional clauses shall prevail over those of PART II to the extent of such conflict but no further.

| Signature (Owners)<br><br>Wu Xiao Ming COSCOL Chief Representative Houston | Signature (Charterers) |

ESCOPEIA_0005682

PART II
"HEAVYCON" Standard Transportation Contract

1. **Definitions**
In this Contract the following words and expressions shall have the meanings hereby assigned to them.   2
   1.1. 'The Owners' shall mean the party identified in Box 2.   3
   1.2. 'The Charterers' shall mean the party identified in Box 3.   4
   1.3. 'The Vessel' shall mean the transportation unit(s) described in Box 4.   5
   1.4. 'Loading port' shall mean the port(s) or area(s) specified in Box 5.   6
   1.5. 'Discharging port' shall mean the port(s) or area(s) specified in Box 7.   8
   1.6. 'The Cargo' shall mean any goods or equipment or other items described in Box 3.   9
   1.7. 'The Transportation' shall mean the carriage of the cargo and, as the case may be, the loading, discharge and all other operations connected therewith.   13

2. **Voyage**   14
   2.1. It is agreed between the Owners mentioned in Box 2 and the Charterers mentioned in Box 3 that, subject to the terms and conditions of this Contract, the cargo described in Box 4 shall be transported by the Owners from the loading port(s) mentioned in Box 5, or so near thereunto as she may safely get and lie always safe and afloat, to the discharging port(s) mentioned in Box 7, or so near thereunto as she may safely get and lie always safe and afloat, by means of the Vessel named and described in Box 4 or is an appendix.   22
   2.2. At the commencement of the voyage the Owners shall exercise due diligence in making the Vessel seaworthy. The Owners shall perform the voyage with due despatch unless otherwise agreed.   25

3. **Deviation/Delays/Part Cargo**   26
   3.1. The Vessel has the liberty to sail without pilots, to tow and/or assist vessels in all situations, to deviate for the purpose of saving life, to replenish bunkers and/or to deviate for the purpose of safety of the cargo, crew, Vessel and for any other reasonable purpose.   30
   3.2. Without prejudice to the provisions of Clause 25, should the Master decide, for the purpose of the safety of the cargo, to deviate from the normal route which is stipulated in Box 7, the Charterers shall pay for all time lost as a consequence of the deviation at the demurrage rate stipulated in Box 15. The time lost shall include all time used until the Vessel reaches the same or equidistant position to that where the deviation commenced and the Charterers shall also pay all additional expenses incurred by such deviation including bunkers, port charges, pilotage, tug boats, agency fees and any other expenses whatsoever incurred.   39
   3.3. If the Vessel for reasons beyond the Owners' control is being delayed at loading port(s) or place(s) and/or discharging port(s) or place(s), including obtaining free pratique, customs, port clearance or other formalities, such delays shall be paid for by the Charterers at the demurrage rate stipulated in Box 15.   44
   3.4. Unless the cargo is described as a full and complete cargo in Box 5, the Owners shall have the liberty of receiving the cargo and of loading and of discharging other part cargo(es) for the account of others than the Charterers from places and/or at not enroute to places enroute or not enroute. The rotation of loading and discharging places shall be at the Owners' option.   49
   When the Owners exercise such option(s) this shall in no way constitute a deviation notwithstanding anything else contained in this Contract.   51

4. **Loading and Discharging**   52
   4.1. The Charterers shall have the cargo in all respects ready for the said voyage at the loading port(s) on the date for which notice of expected loadreadiness is given by the Owners as per Clause 9, but not before the date stated in Box 10 as first layday.   56
   The precise loading area or place within the agreed loading port, which shall be always safe and accessible and suitable for the loading operation, shall be nominated by the Charterers upon receipt of ten (10) days notice by the Owners pursuant to Clause 9, always subject to the approval of the Owners and the Master. Such approval shall not be unreasonably withheld.   61
   4.2. The Owners shall provide the equipment stated in Box 4 or in an appendix and shall in their own time and at their own expense prepare such equipment for the loading. All other equipment shall be provided by the Charterers. When the cargo has been loaded and positioned, it shall be seafastened and/or lashed by the Owners at their expense to the satisfaction of the Master.   67
   4.3. At the loading port, the cargo shall be delivered by the Charterers without delay in the sequence required by the Master at any time during day or night, Saturdays, Sundays and holidays included and shall be loaded by one or more of the following methods stated in Box 6:   71
   7. (a) If agreed in Box 6 that the Owners shall load the cargo with their own gear or tackle, the Charterers shall bring the cargo alongside within reach of   73

such loading equipment. The Owners shall procure the necessary labour and winchmen, either from the crew or from ashore and shall pay for same except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.   77
7. (b) If agreed in Box 6 that the Charterers shall perform the loading, the cargo shall be placed on board and positioned by the Charterers to the full satisfaction of the Master. The Charterers shall procure and pay for all labour and all necessary equipment other than that stated in Box 4.   81
7. (c) If agreed in Box 6 that the cargo shall be loaded by means of float-on method, the Charterers shall position the cargo prior to loading at full draft or at an agreed distance from the Vessel's submerged deck to the full satisfaction of the Master. The Owners shall attach lines to the cargo and shall position and secure the cargo over the submerged deck by using winches and/or tugs. The Owners shall procure and pay the necessary labour and winchman either from the crew or from ashore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.   90
   The Charterers shall procure and pay for workboats and tugs required for the positioning of the cargo. The Owners shall have the right to use such workboats and tugs for the loading operation relinquishing the Charterers for the actual costs for the use thereof from the time the Vessel's first line is attached to the cargo until the time when the last line is released from the cargo and the workboats and tugs are dismissed by the Owners.   96
7. Indicate alternative(s) (a), (b) or (c), as agreed, in Box 6.   97
   4.4. The precise discharging area or place within the discharging port and which shall be always safe and accessible and suitable for the discharging operation, shall be named by the Charterers well in advance of the Vessel's arrival, always subject to the approval of the Owners. Such approval shall not be unreasonably withheld.   102
   At the discharging port the Charterers shall take delivery of the cargo without delay in accordance with Clause 4.5 at any time during day or night Saturdays, Sundays and holidays included.   105
   4.5. Prior to actual discharge the Owners shall, unless otherwise agreed, remove all seafastening and/or lashing and prepare the Vessel for the discharge operation. The entire discharge operation always to be done to the full satisfaction of the Master.   109
   4.6. The cargo shall be discharged by one or more of the following methods stated in Box 6:   111
   7. (a) If agreed in Box 6 that the Owners shall discharge the cargo with their own gear or tackle, the Charterers shall take delivery of the cargo upon discharge and within reach of said gear or tackle. The Owners shall procure and pay for necessary winchmen and labour to perform the discharge except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.   117
   7. (b) If agreed in Box 6 that the Charterers shall discharge the cargo, the Charterers shall procure and pay for the necessary equipment and labour for the discharge of the cargo.   120
   7. (c) If agreed in Box 6 that the cargo shall be discharged by means of float-off method, the Owners shall submerge the Vessel and float-off the cargo. The Owners shall procure and pay the necessary labour and winchmen either from the crew or from shore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account. The Charterers shall procure and pay for workboats and tugs required for discharging the cargo. The Owners shall have the right to use such workboats and tugs for the discharging operations reimbursing the Charterers the actual cost for the use thereof from the time when the first line is attached to the cargo until the time when the last part of the cargo passes the side of the Vessel at which time the Charterers shall take delivery of the cargo.   132
   7. Indicate alternative(s) (a), (b) or (c), as agreed, in Box 6.   133
   4.7. All expenses associated with the Vessel such as harbour dues, pilotages, local tug assistance, if required, agency fees, fuel and lubricants shall be paid for by the Owners except as otherwise provided for in this Contract.   136

5. **Permits/Licences**   137
   5.1. All necessary permits and/or licences pertaining to the loading and/or discharging operations shall be provided and paid for by the Charterers. The same applies to permits and/or licences pertaining to the carriage of cargo, if required, the Owners shall assist the Charterers in obtaining such permits and/or licences.   142
   5.2. Any delay by the Charterers in obtaining the permits and/or licences related to sub-clause 5.1 shall be at the Charterers' time and any time lost shall be paid for at the demurrage rate stipulated in Box 15.   145

6. **Taxes, Charges, etc.**   146
   The Charterers shall pay all duties, taxes and charges whatsoever levied on the cargo and/or the freight at the loading port and/or discharging port incurring   148

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the preprinted text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPETA_0005683

PART II
"HEAVYCON" Standard Transportation Contract

spective of how the amount thereof may be assessed, including agency   149
commission assessed on the basis of the freight.   150

7.   Quarantine   151
Unless due to health conditions on board the Vessel, any time lost as a re-   152
sult of quarantine formalities and/or health restrictions imposed or incurred   153
at any stage of the voyage, including any such loss of time at the loading   154
port and/or the discharging port, shall be paid for by the Charterers at the   155
demurrage rate specified in Box 18. The Charterers shall pay for all   156
other expenses which may be incurred as a result thereof.   157

8.   Commencement of Loading/Cancelling Date   158
8.1. The date of commencement of the loading shall be at any time on or be-   159
tween the dates mentioned first layday stated in Box 19 and the cancelling   160
date stated in Box   161
14, both dates inclusive, in the Owners' option. Should the Owners give no-   161
tice of readiness prior to the first layday, the Charterers may, at their option   162
accept such an earlier loading date and the time shall count against   163
the free time as per Clause 12.   164
8.2  Should it clearly appear that the Vessel will not be ready to commence   165
the loading latest on the cancelling date the Owners shall immediately notify   166
the Charterers hereof and state a new cancelling date as soon as they are in   167
a position to state with reasonable certainty such new cancelling date.   168
Within 72 running hours after receipt of the Owners' notice as aforesaid and   169
latest when the Vessel is ready for loading, whichever is the earlier, the   170
Charterers shall advise the Owners whether they elect to cancel this Con-   171
tract, failing such advice the new cancelling date as notified by the Owners   172
shall apply.   173
8.3. Should the Charterers cancel the Contract according to sub-clause   174
8.2., any amount paid to the Owners in advance and not earned shall be re-   175
turned to the Charterers by the Owners unless the delay was caused by   176
Shipers U/K (in the Sable project  in which case the termination be   
stated in Box 23 shall be paid by Charterers) to Owners.   
8.4.  The Owners shall not be responsible for any loss or damages whatso-   177
ever incurred by the Charterers as a result of the Owners cancelling this   178
Contract as per sub-clause 8.2 nor shall the Owners be responsible for any   179
loss of damages whatsoever suffered by the Charterers as a result of the fal-   180
lure of the Vessel to be ready for loading latest on the last date of the   181
loading window  cancelling date
agreed in Box 19 14 in the case that a new cancelling date has been agreed.   182
8.5. Should the cargo for reasons beyond the Owners' control not be loaded   183
within 14 days from tendering of notice of readiness, the Owners shall have   184
the option to cancel this Contract.   185
If the Owners exercise their option to cancel the Contract in accordance   186
with this sub-clause, the Charterers shall pay to the Owners the applicable   187
termination fee according to the provisions of Clause 20 in addition to any   188
demurrage incurred.   189

9.   Notices   190
9.1. Advance Notices of Expected Loadreadiness   191
The Owners shall give notices as per Box 12 of the expected day of the Ves-   192
sel's readiness to load 14 (fourteen) days, 7 (seven) days and 3 (three) days   193
in advance. Furthermore, the Owners shall give 24 (twenty-four) hours ap-   194
proximate notice of the expected hour of the Vessel's readiness to load.   195
9.2. Notice of Readiness   196
The Owners shall give notice of readiness by letter, cable, telex or telepho-   197
ne as per Box 12 advising when the Vessel is ready to commence loading at   198
the loading port and when the Vessel is ready to commence discharge at the   199
discharging port as per Box 13. All notices may be given at any time of the   200
day, Fridays, Saturdays, Sundays and holidays included and notwithstand-   201
ing hindrances as referred to in Clause 3.3.   202
9.3. During the voyage the Owners shall give notice of expected time of arri-   203
val at discharging port(s) with intervals of the number of days stipulated in   204
Box 13.   205

10.   Marine Surveyor/Condition of the Vessel and Cargo   206
10.1. The Marine Surveyor(s) stated in Box 14 will be appointed for this   207
transportation. If Box 14 has not been filled in the Charterers and the Own-   208
ers shall agree on the appointment of Marine Surveyor(s) acceptable to the   209
cargo underwriters.   210
10.2. All relevant documentation required by the Marine Surveyor(s) for   211
their approval of the transportation shall be submitted to the Marine Sur-   212
veyor at the earliest possible stage after this Contract is made, if not already   213
submitted earlier. As soon as possible after submission of the relevant do-   214
cumentation, transportation approval shall be given by the Marine Surveyor   215
The Charterers shall pay all expenses relating to the production of docu-   216
mentation related to the cargo and/or the Charterers' equipment. The Own-   217

ers shall pay all expenses relating to documentation related to the Vessel   218
and all other equipment being provided paid for owners in the performance of   219
the transportation.   220
10.3. The Charterers shall arrange and pay for all the Marine Surveyor(s)   221
services, including their approval of the transportation.   222
10.4. Should the Marine Surveyor(s) not give transportation approval with-a   223
21 days of Owner's tendering notice of  readiness approval by the   
date stipulated in Box 14, both the Charterers and the Owners may elect to   224
terminate this Contract and all freight paid for advanced by the Charterers to   225
the Owners shall be promptly refunded unless such approval was   226
withheld because of circumstances beyond Owner's reasonable conrol   
and responsibility.   
10.5. The Charterers warrant that the full description of the cargo mentioned   227
in Box 5 is correct and further warrant that the cargo is in all respects tight,   228
staunch, strong and in every way fit for the transportation.   229
Should the cargo and/or its description not be in compliance with the afore-   230
said then the Owners shall have the option to cancel this Contract.   231
If the Owners exercise their option to cancel the Contract in accordance   232
with this Clause the Charterers shall pay to the Owners the applicable termi-   233
nation fee according to the provisions of Clause 20.   234

11.   Freight   235
The freight stipulated in Box 15 shall be paid in instalments as per Box 16S   236
and clause 33 follows 50%
upon signing of this Contract and the balance shall be fully prepaid upon   237
completion of loading against surrender of the Cargo Receipt or Bills of La-   238
ding whichever the case may be. The freight shall be considered earned   239
upon completion of loading and shall be non returnable whether the Vessel   240
and/or cargo is lost or not lost and whether lost due to perils of the sea or   241
howsoever. The freight instalments shall be paid discountless and be tele-   242
graphically remitted in the currency and paid into the Owners' bank ac-   243
count stipulated in Box 16.   244

12.   Free Time/Demurrage   245
12.1. The Charterers are allowed the free time stipulated in Box 17 in the   246
loading and discharging port(s) and for canal transit if applicable  Fridays   247
Saturdays, Sundays and holidays included.   248
The free time at the loading port(s) shall start counting 6 running hours after   249
notice of readiness has been tendered in accordance with Clause 9.2.,   250
whether in berth or not, unless loading has commenced earlier and shall   251
count until the first of the Vessel's trons is attached to the cargo, re-   252
positioned alisers the submerged deck in all respects fully ballasted on   
board the Vessel
and approved by the Marine Surveyor(s).   253
The free time at the discharging port(s) shall start counting  6 running hours   254
after notice of readiness  has been tendered in accordance with Clause 9.2,   255
whether in berth or not, unless discharge has commenced earlier and shall   256
count until the cargo is discharged and afloat approximately 50 meters   257
off the Vessel in all respects removed from the Vessel.   
If the Owners are to load and discharge the cargo in accordance with Clau-   258
ses 4.2. (a) or (c) and 4.6. (a) or (c) free time or time on demurrage shall not   259
count for time used for the actual loading and discharge operation in excess   260
of the fixed hours stipulated in Box 17 of Part I, unless such time used is ex-   261
cess of the fixed time is due to reason beyond the Owners' control.   262
12.2. Demurrage shall be payable for all time used in excess of the free time.   263
The demurrage rate for the Vessel is the amount stipulated in Box 18 calcu-   264
lated pro rata per day or part of a day.   265
12.3. Free time shall not count and if the Vessel is on demurrage, demurra-   266
ge shall not accrue for time lost by reason of strike or lockout of the Master,   267
officers or crew or by reason of breakdown of the Vessel or the Owners'   268
equipment.   269
12.4. The demurrage and other amounts which are calculated at the demur-   270
rage rate fall due and are payable by the Charterers immediately upon pre-   271
sentation of the Owners' invoice to the Charterers' bank account stipulated in   272
Box 16.   273
Should more than 14 days of demurrage have accrued, the Owners are en-   274
titled to demurrage on account. The Owners may demand payment against   275
presentation of invoices covering the first 14 days and thereafter for every 7   276
days.   277

13.   Mobilisation/Demobilisation   278
13.1. Mobilisation   279
If agreed upon in Box 12 the Charterers shall pay the lump sum stipulated   280
therein in respect of mobilisation which amount shall be deemed and non-   281
returnable upon the Vessel's arrival in the loading port.   282
13.2. Demobilisation   283

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II

## "HEAVYCON" Standard Transportation Contract

if agreed upon in Box 20 the Charterers shall pay the lump-sum stipulated    284
therein in respect of demobilisation, which amount shall be earned and    285
non-returnable upon the Vessel's arrival at the discharging port.    286
13.3. The mobilisation and demobilisation amounts shall be payable    287
against the Owners' invoice.    288

### 14. Canal Transit    289

14.1. If the transportation is scheduled to pass through a canal according to    290
Box 7, the Charterers are granted free time for any such transit, and such    291
free time shall count against the number of hours stipulated in Box 17 all the    292
transportation is delayed beyond the free time stipulated therein, the Char-    293
terers shall pay for such extra transit time at the rate of demurrage stipula-    294
ted in Box 18 and shall, in addition, pay for all other documented extra ex-    295
penses thereby incurred. Canal transit time is defined as from arrival of pi-    296
lot station or customary waiting place or anchorage, whichever is the ear-    297
lier, and until dropping last outbound pilot when leaving the open sea.    298
14.2. The freight rate stipulated in Box 15 is based upon the Owners paying    299
canal tolls limited to the amount stipulated in Box 21. Any increase in the ca-    300
nal tolls and/or any additional expenses imposed on the transportation to    301
the canal transit actually paid by the Owners, shall be reimbursed by the    302
Charterers to the Owners upon presentation of the Owners' invoice.    303
14.3. Should the transit of a canal be made impossible for reasons beyond    304
the Owners' control, the Charterers shall pay for all extra time by which the    305
voyage is thereby prolonged at the rate of demurrage stipulated in Box 18.    306
The Charterers shall also pay all other expenses, if during for bunkers, in    307
addition to those which would normally have been incurred had the Vessel    308
been standing by to prosecute the amount of canal tolls being refunded to the    309
Owners for not having transitted the canal.    310
14.4. Notwithstanding the provisions of sub-clause 14.3, the Owners may, at    311
their sole discretion, instruct the Master to discharge the cargo at the nea-    312
rest, safe and reachable port or place and such discharge shall be deemed    313
due fulfilment of this Contract. All provisions of this Contract regarding    314
freight, discharge of the cargo, free time and demurrage as agreed for the    315
original discharging port shall also apply to the discharge of the substitute    316
port.    317

### 15. Bunker Escalation    318

This Contract is concluded on the basis of the price per ton for bunker oil    319
stated in Box 22 in force on the date of this Contract.    320
If the price actually paid by the Owners for the quantity of bunker oil consu-    321
med during the transportation should be higher, the difference shall be paid    322
by the Charterers to the Owners.    323
If the price actually paid by the Owners for the quantity of bunker oil consu-    324
med during the transportation should be lower, the difference shall be paid    325
by the Owners to the Charterers.    326

### 16. Ice    327

16.1. If on passage to the loading port or discharging port the Master finds    328
that the port cannot be safely reached owing to ice, the Owners shall re-    329
quest the Charterers to immediately nominate an alternative safe, ice-free    330
and accessible port where there are facilities for loading or discharging the    331
cargo. In this event, freight shall be paid at the rate applicable under this    332
Contract to such alternative loading or discharging port and, in addition, any    333
period by which the time taken to reach either or both such alternative ports    334
exceeds the time which would have been taken had the Vessel proceeded    335
ti/their direct shall be paid for by the Charterers at the rate of demurrage    336
specified in Box 18 per running day and pro rata for part of a running day as    337
well as the costs of any additional bunkers consumed. If no rate of freight is    338
specified in Box 15 for the selected alternative port, then freight shall be    339
paid at the rate applicable to the voyage first nominated adjusted by allow-    340
ance at the demurrage rate specified in Box 18 for the difference in the time    341
taken for the actual voyage and the estimated time required to perform the    342
first nominated voyage, the costs of the difference in bunker oil consump-    343
tion and the difference, if any, in port charges at the respective ports.    344
16.2. If on or after the Vessel's arrival at or off the nominated loading port or    345
discharging port there is a danger of the Vessel being frozen in, the Master    346
shall be at liberty to proceed to the nearest safe and ice-free position and    347
shall, at the same time, request the Charterers by radio for revised orders.    348
Immediately upon receipt of such request, the Charterers shall give orders    349
for the Vessel to proceed to an alternative safe, ice-free and accessible port    350
where there is no danger of Vessel being frozen in and where there are faci-    351
lities for loading or discharging the cargo.    352
If the Vessel is ordered to proceed to an alternative port, the same in respect    353
of freight and delay to be paid by the Charterers shall be as specified in sub-    354
clause 16.1., but if the Vessel loads or discharges at the nominated port    355
then the whole of the time occupied from the time the Master's request for    356
revised orders has been received by the Charterers until completion of loa-    357

ding or discharging shall count against free time or, if the Vessel is in de-    358
murrage, for demurrage. Any delay caused by reasons of the Vessel being    359
ordered to a port where there is danger of being frozen in shall count against    360
free time or, if the Vessel is on demurrage, for demurrage.    361
16.3. The Vessel shall not to be obliged to force ice nor to follow icebreakers.    362

### 17. Dangerous Cargo    363

If part of the cargo is of an inflammable, explosive or dangerous nature or    364
condition or at any stage may develop into such nature or condition it must    365
be packed and stored or stowed in accordance with IMO Dangerous Goods    366
Code and/or other applicable regulations always to the full satisfaction of    367
the Master. Any delay to the transportation in this respect shall be paid for    368
by the Charterers at the demurrage rate stipulated in Box 18.    369

### 18. Lien    370

The Owners shall have a lien on the cargo and any Charterers' equipment    371
for all freight and all other expenses in relation to the transportation, dead-    372
freight, advances, demurrage, damages for detention, general average and    373
salvage including costs for recovering same.    374

### 19. Substitution    375

The Owners shall, at any time before the last day of the loading window    376
specified in Box 8, be entitled to sub-    377
stitute the Vessel named in Box 4 with another vessel of equivalent capabi-    377
lity and capacity, provided such substitute vessel is approved by the Mari-    378
ne Surveyor. Nothing herein shall be construed as imposing on the Owners    379
an obligation to make such substitution.    380

### 20. Termination    381

20.1. Notwithstanding anything else provided herein, the Charterers shall    382
have the right to terminate this Contract prior to the Vessel's arrival at the    383
first loading port against payment of the applicable amount stipulated in Box    384
23 less any prepaid freight.    385
20.2. Furthermore, the Charterers shall have the right to terminate this Con-    386
tract after the Vessel's arrival at the first loading port but not later than upon    387
commencement of loading against payment of the applicable amount stipu-    388
lated in Box 23 plus compensation for all time spent at the first loading port    389
at the demurrage rate stipulated in Box 18 less any prepaid freight together    390
with the actual expenses incurred by the Owners in preparation for the loa-    391
ding.    392
20.3. If Box 23 is not filled in this Clause shall not apply.    393

### 21. Liability for Cargo - Bill of Lading or Cargo Receipt    394

21.1. Notwithstanding anything else contained herein, the Owners shall be    395
liable for all loss or damage of whatsoever nature to or sustained by the Ves-    396
sel, any liability in respect of wreck removal and the expense of moving,    397
lighting or buoying the Vessel, and any liability in respect of death or injury    398
of any of the Owners' employees, servants, agents or sub-contractors' per-    399
sonnel, and any liability in respect of other cargo on board not the subject of    400
this Contract, all of which shall be for the sole account of the Owners without    401
recourse to the Charterers, their servants or agents, and the Owners shall    402
indemnify, defend and hold the Charterers harmless from and against any    403
and all claims, losses, costs, damages and expenses of every kind and na-    404
ture including legal expenses arising from the foregoing.    405
21.2. Notwithstanding anything else contained herein, the Charterers shall    406
be liable for all loss or damage or delay of whatsoever nature and howso-    407
ever caused to or sustained by the cargo, including any property carried,    408
owned, hired and/or leased by the Charterers on board, and any liability in    409
respect of wreck removal and the expense of moving, lighting or buoying the    410
cargo, and any liability in respect of death or injury of any of the Charterers'    411
employees, servants, agents or sub-contractors' personnel, or the Marine    412
Surveyor(s) personnel, and all liabilities consequent upon loss, damage or    413
delay to the cargo, all of which shall be for the sole account of the Charte-    414
rers without recourse to the Owners, their servants or agents or insurers and    415
the Charterers shall indemnify, defend and hold all these harmless from and    416
against any and all claims, losses, costs, damages and expenses of every    417
kind and nature including legal expenses arising from the foregoing.    418
21.3. The Owners and the Charterers shall agree and state in Box 24 whe-    419
ther a Bill of Lading or a non-negotiable Cargo Receipt will be issued by Ow-    420
ners upon loading of the cargo.    421
21.4. Bill of Lading    422
(a) If, as stated in Box 24, the Owners have agreed to issue a Bill of Lading,    423
same shall be as per the "Heavyconbill" form which shall incorporate all    424
terms, conditions, liberties, clauses and exceptions of this Contract, inclu-    425
ding the Arbitration Clause.    426
(b) The Owners shall not be liable for any loss, damage or delay to cargo in    427
the period before loading and after discharge.    428
(c) Unless otherwise agreed, the cargo shall be shipped on deck at Ship.    429

This document is a computer generated HEAVYCON form edited by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPEIA_0005685

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made in the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPEIA_0005686

PART II
"HEAVYCON" Standard Transportation Contract

terers declare (within 24 hours of receipt of Owners' notification of intended 579
cancellation) that they agree to count the time at port of discharge as if there 580
were no such hindrance, without prejudice to the Charterers' right of order- 581
ing the Vessel to a substitute port of discharge in accordance with sub- 582
clause 28.4. Time for loading does not count in the said 24 hours. 583
26.4. Discharging port. In the event of strike or lock-out affecting the dis- 584
charging of the cargo on or after Vessel's arrival at or off the port of dis- 585
charge, the Charterers shall have the option of keeping the Vessel waiting 586
up to maximum 7 days against paying demurrage after the expiration of the 587
time provided for discharging or of ordering the Vessel to a safe port where 588
she can safely discharge without risk of being detained by strike or lock- 589
out. Such orders to be given within 48 hours after the Owners have given no- 590
tice to the Charterers of Vessel's readiness to discharge or of the Owners' 591
request for orders. After waiting 7 running days, the Owners shall be at liber- 592
ty to discharge the cargo at any safe port which they may, in their discretion, 593
decide on and such discharge shall be deemed to be due fulfilment of the 594
Contract. In the event of cargo being discharged at any such other port, the 595
Owners shall be entitled to freight as if the discharge had been effected at 596
the port or ports named in the Bill(s) of Lading or to which the Vessel may 597
have been ordered pursuant thereto. 598
26.5. Notification. The party who first learns about the occurrence of strike 599
or lock-out shall immediately notify thereof the other party. 600

27. War Risks 601
27.1. In these clauses "War Risks" shall include any blockade or any action 602
which is announced as a blockade by any Government or by any belligerent 603
or by any organised body, sabotage, piracy, and any actual or threatened 604
war, hostilities, warlike operations, civil war, civil commotion, or revolution. 605
27.2. If at any time before the Vessel commences loading, it appears that 606
performance of the Contract will subject the Vessel or her Master and crew 607
or her cargo to war risks at any stage of the adventure, the Owners shall be 608
entitled by letter or telegram despatched to the Charterers, to cancel this 609
Contract. 610
27.3. The Master shall not be required to load cargo or to continue loading 611
or to proceed on or to sign Bill(s) of Lading for any adventure on which or 612
any port at which it appears that the Vessel, her Master and crew or her 613
cargo will be subjected to war risks. In the event of the exercise by the Mas- 614
ter of his right under this Clause after part or full cargo has been loaded, the 615
Master shall be at liberty either to discharge such cargo at the loading port 616
or to proceed therewith, in the latter case the Vessel shall have liberty to 617
carry other cargo for Owners' benefit and accordingly to proceed to and 618
load or discharge such other cargo at any other port or ports whatsoever 619
backwards or forwards, although in a contrary direction to or out of or 620
beyond the ordinary route. In the event of the Master electing to proceed 621
with part cargo under this Clause freight shall in any case be payable on the 622
quantity delivered. 623
27.4. If at the time the Master elects to proceed with part or full cargo under 624
sub-clause 27.3., or after the Vessel has left the loading port, or the last of 625
the loading ports, it more than one, it appears that further performance of the 626
Contract will subject the Vessel, her Master and crew or her cargo, to war 627
risks, the cargo shall be discharged, or if the discharge has been com- 628
menced shall be completed, at any safe port in vicinity of the port of dis- 629
charge as may be ordered by the Charterers. If no such orders shall be re- 630
ceived from the Charterers within 48 hours after the Owners have des- 631
patched a request by telegram to the Charterers for the nomination of a 632
substitute discharging port, the Owners shall be at liberty to discharge the 633
cargo at any safe port which they may in their discretion, decide on and 634
such discharge shall be deemed to be due fulfilment of the Contract. In the 635
event of cargo being discharged at any such other port, the Owners shall be 636
entitled to freight as if the discharge had been effected at the port or ports 637
named in the Bill(s) of Lading or to which the Vessel may have been ordered 638
pursuant thereto. 639
27.5.(a) The Vessel shall have liberty to comply with any directions or re- 640
commendations as to loading, departure, arrival, routes, ports of call, stop- 641
pages, destinations, zones, waters, discharge, delivery or in any other wise 642
whatsoever (including any direction or recommendation not to go to the 643
port of destination or to delay proceeding thereto or to proceed to some 644
other port) given by any Government or by any belligerent or by any orga- 645
nized body engaged in civil war, hostilities or warlike operations or by any 646
person or body acting or purporting to act as or with the authority of any Go- 647
vernment or belligerent or of any such organized body or by any committee 648
or person having under the terms of the war risks insurance on the Vessel, 649
the right to give any such directions or recommendations. If, by reason of 650
or in compliance with any such direction or recommendation, anything is 651

done or is not done, such shall not be deemed a deviation. 652
(b) If, by reason of or in compliance with any such directions or recommen- 653
dations, the Vessel does not proceed to the port or ports named in the Bill(s) 654
of Lading or to which she may have been ordered pursuant thereto, the Ves- 655
sel may proceed to any port as directed or recommended or to any safe port 656
which the Owners in their discretion may decide on and there discharge the 657
cargo. Such discharge shall be deemed to be due fulfilment of the Contract 658
and the Owners shall be entitled to freight as if discharge had been effected 659
at the port or ports named in the Bill(s) of Lading or to which the Vessel may 660
have been ordered pursuant thereto. 661
27.6. All extra expenses including extra war risks insurance costs incurred 662
in performance of the transportation and discharging of the cargo at the 663
loading port or in reaching or discharging the cargo at any port as provided 664
in sub-clauses 27.4. and 27.5.(b) of this Clause shall be paid by the Char- 665
terers, and the Owners shall have a lien on the cargo for all sums due under 666
this Clause. 667

28. Limitation of Liability 668
Any provisions of this Contract to the contrary notwithstanding, the Owners 669
shall have the benefit of all limitations of, and exemptions from, liability ac- 670
corded to the Owners or chartered Owners of vessels by any applicable 671
statute or rule of law for the time being in force, and the same benefits to ap- 672
ply regardless of the form of signatures given to this Contract. 673

29. Interests 674
If any amounts due under this Contract are not paid when due, then interest 675
at the rate of 1.5% per month or pro rata for part of a month shall be paid on 676
all such amounts until payment is received. 677

30. Agency 678
Vessel shall be addressed to Owners' agents at port(s) of loading and dis- 679
charging 680

31. Brokerage 681
The Owners shall pay a brokerage at the rate stated in Box 26 to the Brok- 682
er(s) mentioned in Box 26 on any freight, demurrage, mobilisation fee, de- 683
mobilisation fee and/or termination fee paid under this Contract. 684
If the full amounts as aforesaid are not paid owing to breach of this Contract, 685
by either of the parties, the party liable thereof shall indemnify the Broker(s) 686
against his or their loss of brokerage. 687

32. Law and Arbitration 688
*) 32.1. If agreed and stated in Box 27, this Contract shall be governed by Eng- 689
lish law and any dispute arising out of this Contract or Cargo Receipt or any 690
non-negotiable bill-of-lading any Bill-of-Lading is- 691
sued thereunder shall be referred to arbitration in London, one arbitrator 692
being appointed by each party, in accordance with the Arbitration Acts 693
1950 and 1979 or any statutory modification or re-enactment thereof for the 694
time being in force. On the receipt by one party of the nomination in writing 695
of the other party's arbitrator, that party shall appoint their arbitrator within 696
fourteen days, failing which the decision of the single Arbitrator appointed 697
shall apply. If two Arbitrators properly appointed shall not agree they shall 698
appoint an umpire whose decision shall be final. 699
*) 32.2. If agreed and stated in Box 27, this Contract shall be governed by U.S. 699
Law and all disputes arising out of this Contract or any Bill of Lading issued 700
thereunder shall be arbitrated at New York in the following manner: 701
One arbitrator is to be appointed by each of the parties hereto and a third by 702
the two so chosen. Their decision or that of any two of them shall be final, 703
and for the purpose of enforcing any award, this agreement may be made a 704
rule of the court. The Arbitrators shall be commercial men. Such Arbitration 705
is to be conducted in accordance with the rules of the Society of Maritime 706
Arbitrators, Inc., New York, as currently amended. 707
A sole arbitrator may be appointed, if so desired by both parties. 708
Either party may call for arbitration by notice of notice upon the other. If the 709
other party does not appoint its arbitrator within fourteen days of such writ- 710
ten notice, then the first moving party shall have the right, without further no- 711
tice, to appoint a second arbitrator, with the same force and effect as if said 712
second arbitrator had been appointed by the other party. 713
*) 32.3. If agreed and stated in Box 27, any disputes arising out of the Contract 714
or any Bill of Lading issued thereunder shall be referred to arbitration at the 715
place indicated in Box 27, subject to the law and procedures applicable 716
there. 717
32.4. If Box 27 is not filled in, sub-clause 32.1. of this Clause shall apply. 718
*) Indicate alternative 32.1., 32.2. or 32.3. as agreed in Box 27. 719

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPETA_0005687

## Additional Clauses:

Referring to this contract no 2219 dated 9th February 2006 between Escopeta Oil & Gas Corporation, herewith referred to as Charterers and COSCO Shipping Company Limited, herewith referred to as Owners, the following has been agreed:

### Clause 33: Freight Payment

The freight is payable as follows:

10% ten (10) banking days after signing the contract
40% five (5) banking days after the arrival at loading location
50% five (5) banking days prior arrival at discharge location before releasing the cargo receipt

Should the entire freight from Charterer's bank not have been received by Owners in time the Owners will have the right to postpone the discharge operation, standing-by, which time will be charged at the demurrage rate until the moment the freight has been received by Owners

### Clause 34: Transit Time
Expected transit time given by owners for information purposes only: 48 days weather delay, engine breakdown, force majeure, Act of God, and sailing restriction(s) imposed by the nominated marine warranty surveyor excluded.

### Clause 35: Aft Bouyancy Casings
The standard position of the buoyancy casings is in the aft position for float-on/float-off operations. Should charterers require the aft bouyancy casing to be shifted then time and cost to be for charterers account.

### Clause 36: Daily Position Reports
Owners to provide Charterers with daily weather and voyage reports.

### Clause 37: Jones Act
All Jones Act issues shall be addressed and sole reposibility of the Charterers. If any Jones Act issues arrise, Charterers agree to discharge the Cargo in Canada or other port agreed upon by Owners and Charterers. Deviation, if any, to be for Charterers time and account

### Clause 38: Management approval
This contract is subject to Charterers management approval by which must be given in writing to Owners no later than Wednesday, February 15th at 17:00 hours.

ESCOPETA_0005688

# EXHIBIT 2

ADDENDUM NO 1

TO

TRANSPORTATION CONTRACT

DATED

9 FEBRUARY 2006

BETWEEN

COSCO SHIPPING COMPANY LIMITED ("THE OWNERS")

AND

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract the Parties have today agreed as follows:

1. Box 7 Discharging port(s) and intended route from loading to discharge port – The Parties have agreed that the route between Sabine Pass, USA and Cooks Inlet, USA (subject Jones Act issue referred to in Clause 37 of contract) will be via the Cape of Good Hope.
2. Box 15 Freight – The Parties have agreed that the freight will be increased to USD 54,710,000.00.

All other terms and conditions of the above mentioned Contract to remain unchanged.

Houston
7 April 2006

_____
Cosco Shipping Company Limited

_____
Escopeta Oil & Gas Corporation
4/25/06

# EXHIBIT 3

Addendum #4 to BIMCO Heavycon contract #2219

DATED 9th February 2006

between

COSCO (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD ("THE OWNERS")

And

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract, the Parties have today agreed as follows:

1) Change Box 10 (First Layday) – Delete "Loading window 1 – 30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning" and Add "Loading Window November 15, 2006 – December 1, 2006."

2) Change Box 11 (Cancelling date) – Delete "30th June 2006" and add "December 1, 2006"

3) Change Box 15 – Delete "U.S. $4,310,000.00" and add "U.S. $5,310,000.00 via Magellan Straights or U.S. $5,710,000.00 via Cape of Good Hope to be declared by September 15, 2006"

4) Change Box 23 – Delete "75% of Freight in Box 15" and add "U.S. $1,482,500.00 if via Magellan Straights or U.S. $1,782,500.00 via Cape of Good Hope

5) Change Box 28 – Delete "38" and Add "39"; 39" after "37"

6) Change Section 8.2 Line 176 – Delete "unless the delay was caused by Saipem UK in the Sable Project in which case the termination fee stated in Box 23 shall be paid by Charterers to Owners"

7) Delete Clause 38

8) Add Clause 39: Postponement & Demurrage Fee
   A postponement fee of U.S. $2,500,000.00 and demurrage fee of U.S. $125,000.00 (U.S. $25,000.00 x 5 days) must be paid in full, less the U.S. $431,000.00 already paid, to Owners by September 15, 2006. These fees are in addition to the freight mentioned in item 3 above.

9) Total amount due paid in full to COSCO. by September 15, 2006 is USD 2,725,000.00. Any dollar amount not paid by September 15, 2006 will be subject to interest terms per clause 29 of the contract.
   $    2,500,000.00  (postponement fee)
   +      125,000.00  (5 days demurrage)
   -      431,000.00  (10% down on original freight)
   +      531,000.00  (10% of new agreed upon freight)
   USD 2,725,000.00

   The remaining freight of USD $4,779,000.00 basis Magellan Straights or USD $5,179,000 basis Cape of Good Hope will be paid as per original payment terms included in clause 33 of the contract.

10) Change "THE OWNERS" to COSCO (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD on addendums 1 & 2.

11) Delete Addendum #3

All other terms and conditions of the above mentioned Contract and Addendums No. 1 and 2 to remain unchanged.

Houston July 21, 2006

COSCO (HK) Investment & Development Co., LTD. ("Owners")

ESCOPETA OIL & GAS CORPORATION ("Charterers")

ESCOPETA_0005636

# EXHIBIT 4

Addendum #5 to BIMCO Heavycon contract #2219

DATED 9th February 2006

between

COSCOL (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD ("THE OWNERS")

And

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract, the Parties have today agreed as follows:

1) Delete Item 1 of Addendum #4.

2) Change Box 10 (First Layday) – Delete "Loading window 1 – 30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning" and Add "Loading Window April 1, 2007 – Apr 30, 2007. "

3) Delete Item 2 of Addendum #4.

4) Change Box 11 (Cancelling date) – Delete "30th June 2006" and add "April 30, 2007".

5) Change Item 3 of Addendum #4 – Delete "September 15, 2006" and Add "November 15, 2006".

6) Change Box 23 – Add ", 40" after "39".

7) Add Clause 40: Mobilization Fee
   A Mobilization Fee of U.S. $2,150,000.00, to cover expenses involved with mobilizing ship from the Gulf of Mexico to Yantel, will be paid in full to Owners by October 20, 2006.  This fee is in addition to the freight in Box 15, postponement fee plus interest, and demurrage already owed to Owners.

8) Delete Item 9 of Addendum #4.

9) Total amount due paid in full by Charterers to Owners by October 20, 2006 is USD 4,915,875.00.  If the total amount is not paid by October 20, 2006, Owners have the option to terminate the contract.
   $     2,725,000.00   (as per Item 9 of Addendum #4)
   +     2,150,000.00   (Mobilization Fee)
   +        40,875.00   (1 month interest at 1.5% per month of USD 2,725,000.00)
   USD 4,915,875.00
   The remaining freight of USD $4,779,000.00 basis Magellan Straights or USD $3,170,000 basis Cape of Good Hope will be paid as per original payment terms included in clause 33 of the contract.

All other terms and conditions of the above mentioned Contract and Addendums No. 1, 2, and 4 to remain in effect.

Houston, October 11, 2006

COSCOL (HK) Investment & Development Co., LTD. ("Owners")

ESCOPETA OIL & GAS CORPORATION ("Charterers")