John J. Tomaselli
TOMASELLI & CO.
110 Wall Street
11th Floor, No. 68
New York, New York 10005
Tel: (212) 461-4880
Fax: (212) 214-0318

ATTORNEYS FOR PLAINTIFF
COSCOL (HK) INVESTMENT & DEVELOPMENT CO., LTD.



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

COSCOL (HK) INVESTMENT &
DEVELOPMENT CO., LTD.,

     Plaintiff,

    -against-

ESCOPETA OIL & GAS CORPORATION,

     Defendant.

---

08 Civ. 0864 - DC

**VERIFIED FIRST AMENDED**
**COMPLAINT**

---

  Plaintiff, COSCOL (HK) Investment & Development Co., Ltd. ("Plaintiff" or
"COSCOL"), by and through its attorneys, Tomaselli & Co., for its verified first amended
complaint against Escopeta Oil & Gas Corp. ("Defendant" or "Escopeta"), alleges, upon
information and belief, as follows:

  1.  This is a case of admiralty and maritime jurisdiction under 28 U.S.C. § 1333 as
hereinafter more fully appears and is a maritime claim within the meaning of Rule 9(h) of the
Federal Rules of Civil Procedure.

  2.  At all times material herein, plaintiff COSCOL was and is a business entity
organized and existing under the laws of the Hong Kong Special Administrative Region of the

People's Republic of China with a place of business at Room 4002, 40/F, COSCO Tower, 1B3 Queen's Road Central, Hong Kong.

3.      Upon information and belief, at all times material herein, Escopeta is a business entity having a place of business located at 5005 Riverway, Suite 440, Houston, Texas 77058.

4.      In February 2006, COSCOL and Escopeta entered into a voyage charter party whereby Escopeta chartered the semi-submersible vessel *TAI AN KOU* (the "Vessel") to Escopeta under a HEAVYCON charter party form for a voyage from one safe and suitable loading location, Sabine Pass, USA, to one safe and suitable discharging location, Cooks Inlet, USA (the "Charter"). A true and correct copy of the Charter is annexed as Exhibit 1.

5.      The Charter provided that COSCOL would be paid $4,310,000.00 in freight for transporting the vessel *TELLUS* on the Vessel, which is a heavy lift vessel.

6.      On April 7, 2006, COSCOL and Escopeta entered into Addendum #1 of the Charter, which amended the routing of the Vessel and increased the freight payable to COSCOL to $4,710,000.00. A true and correct copy of Addendum #1 is annexed as Exhibit 2.

7.      In June 2006, COSCOL presented the Vessel to Escopeta in accordance with the Charter. The Vessel stood by awaiting instructions from Escopeta for five days until Escopeta expressly discharged the Vessel because the *TELLUS* was not ready.

8.      Clause 20.2 of Part II of the Charter provides Escopeta the right to cancel performance under the Charter by paying COSCOL a termination fee specified in the Charter. Rather than terminate the Charter, however, Escopeta renegotiated the terms of the Charter to have the Vessel return to perform the requested carriage of the *TELLUS* later in 2006.

9.      Escopeta subsequently requested that COSCOL make the Vessel available during the *TELLUS'* next loading window. COSCOL agreed to do so on the condition that Escopeta

2

enter another addendum, to which condition Escopeta agreed. Addendum #4 to the Charter, reflecting these changes, was executed on July 21, 2006. Addendum #4 provided that Escopeta would pay between $4,779,000.00 and $5,179,000.00 (depending upon the ultimate route selected) without regard to whether the freight actually was carried. A true and correct copy of Addendum #4 is annexed as Exhibit 3.

10.    Escopeta once again requested that COSCOL agree to a revision of the Charter because the TELLUS would not be ready during the agreed loading window. On or about October 11, 2006, Addendum #5 to the Charter was executed between COSCOL and Escopeta. A true and correct copy of Addendum #5 is annexed as Exhibit 4. Addendum #5 to the Charter provides:

> The total amount due paid in full by Charterers [Escopeta] to Owners [COSCOL] by October 20, 2006 is USD 4,915,875.00 If the total amount is not paid by October 20, 2006, Owners have the option to terminate the Contract [Charter].

Addendum #5, Paragraph 5. The payment provided in paragraph 5 of Addendum #5 covered damages suffered by COSCOL resulting from the previous delays, and was in addition to freight to be paid to COSCOL for carrying the *TELLUS*.

11.    COSCOL has performed its obligations under the Charter and under Addendum #5. Escopeta, however, has refused to pay the $4,915,875.00 as required by Addendum #5, despite Escopeta's admission that it owes COSCOL this amount.

12.    Indeed, Escopeta has brought an indemnification claim against its contractual partner(s) Songa Management, Inc. Songa Drilling AS, Songa Drilling Pte Ltd. and Songa Offshore ASA (collectively "Songa") for the amounts that Escopeta owes COSCOL under the Charter and its Addendum #5, which claims Escopeta filed in Texas state court against Songa in

a matter entitled *Escopeta Oil & Gas Corporation v. Songa Management, Inc. et al., Cause No. E-177,288* (the "Texas Proceeding").

13.    COSCOL intervened into the Texas Proceeding in order to preserve its claims against Escopeta.

14.    COSCOL intervened in the Texas Proceeding because, amongst other reasons, COSCOL has determined through investigation that Escopeta appears to have no other assets to its name other than the claim that it possesses against Songa.

15.    As part of the Texas Proceeding, COSCOL, Escopeta and Songa participated in mediation, as a result of which Escopeta and Songa have reached a settlement agreement on Escopeta's claims, by the terms of which settlement Songa and/or its affiliates and/or paying agents will be effecting payment to Escopeta and/or to its payment agents for the benefit of Escopeta within the next few weeks.

16.    Upon information and belief, the payment of these settlement funds for the benefit of Escopeta will be made by one or more of the following Songa entities:

a.    Songa Management, Inc.;

b.    Songa Drilling AS a/k/a Songa Drilling ASA, now known as KCA Deutage Offshore AS a/k/a KCA Deutage Offshore ASA;

c.    Songa Drilling Pte Ltd., now known as KCA Deutage Pte Ltd.;

d.    Songa Offshore ASA a/k/a Songa Offshore AS; and/or

d.    the Abbott Group, plc.

17.    Upon information and belief, the payment of these settlement funds to Escopeta will be made to one or more of the following entities as payment agents for the benefit of Escopeta:

a.    Escopeta Oil & Gas Corporation;

b.    Joseph F. Archer, P.C. or Joe Archer or Joseph F. Archer, P.C. IOLTA Account (counsel for Escopeta);

c.    Mehaffy Weber, P.C. or Mehaffy Weber, P.C. IOLTA Account (counsel for Escopeta);

d.    Ernest W. Boyd or Butch Boyd or Ernest W. Boyd IOLTA Account (counsel for Escopeta);

e.    Chamberlain, Hrdlicka, White, Williams & Martin, P.C. or Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA (counsel for Songa);

f.    Lyman, Twining, Weinberg & Ferrell, P.C. or Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account (counsel for Songa)

g.    Daniel S. Davis (aka Danny Davis); and/or

h.    Centurion Gold Holdings, Inc.

18.    As a result of Escopeta's breaches of the Charter and its addenda, COSCOL has suffered damages in the amount of $4,915,875.00.

19.    Upon information and belief, two years time will have passed between the time when Escopeta breached the Charter and the time when COSCOL will prosecute this claim against Escopeta to its completion. Part I, Clause 27 and Part II, Clause 32 of the Charter provide that the Charter is governed by English law. Under English law and London arbitration (as called for in the underlying charter party), COSCOL is entitled to receive its interest, expenses and reasonable attorneys' fees for prosecuting its claims to completion. The estimated amount of interest (calculated at the contractual rate of 18% per annum) and attorneys' fees is estimated to be $2,019,715.00 as set forth below:

Interest:                    $1,769,715.00 ($4.9 million x 0.18/year x 2 yrs.)
Attorneys' Fees/Expenses:    $  250,000.00

Total:                       $2,019,715.00

20.    Therefore, as a result of the foregoing and Escopeta's breach of its obligations under the Charter, COSCOL has suffered damages in the amount of **$6,935,590.00**, including estimated interest, attorneys' fees and expenses.

21.    Upon information and belief, Escopeta is not found within the Southern District of New York but does have assets, good or chattels that are or will be located within the jurisdiction, including but not limited to the aforementioned settlement proceeds from the settlement of the dispute between Escopeta and Songa, including but not limited to such funds situated in the bank account(s) of or being routed to the defendant Escopeta Oil & Gas Corporation and/or parties who are acting as the paying and/or payment agents for Escopeta and/or are sending and/or receiving funds for the benefit of defendant Escopeta, including but not limited to: (a) Songa Management, Inc.; (b) Songa Drilling AS; (c) Songa Drilling ASA; (d) KCA Deutage Offshore AS; (e) KCA Deutage Offshore ASA; (f) Songa Drilling Pte Ltd.; (g) KCA Deutage Pte Ltd.; (h) Songa Offshore ASA; (i) Songa Offshore AS; (j) Abbott Group, plc.; (k) Joseph F. Archer, P.C.; (l) Joe Archer; (m) Joseph F. Archer, P.C. IOLTA Account; (n) Mehaffy Weber, P.C.; (o) Mehaffy Weber, P.C. IOLTA Account; (p) Ernest W. Boyd; (q) Butch Boyd; (r) Ernest W. Boyd IOLTA Account; (s) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. (t) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA Account; (u) Lyman, Twining, Weinberg & Ferrell, P.C.; (v) Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account; (w) Daniel S. Davis (aka Danny Davis); and/or (x) Centurion Gold Holdings, Inc.

6

22.    Upon information and belief, the assets, goods or chattels referenced in the preceding paragraph are located at the following financial institutions: Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York.

**WHEREFORE**, plaintiff COSCOL (HK) Investment & Development Co., Ltd. prays:

1.    That process in due form of law according to the practice of this Court in the form of a writ of maritime attachment be issued against bank accounts and other property of Escopeta Oil & Gas Corporation with the financial institutions noted above in paragraph 22;

2.    That if defendant Escopeta Oil & Gas Corporation cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant Escopeta Oil & Gas Corporation up to and including the sum of $6,935,590.00 may be restrained and attached, including but not limited to cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant Escopeta Oil & Gas Corporation including but not limited to such assets as may be held, received or transferred in its own name or as may

be held, received or transferred for its benefit by the entities who act as its paying/payment agent(s), namely: (a) Songa Management, Inc.; (b) Songa Drilling AS; (c) Songa Drilling ASA; (d) KCA Deutage Offshore AS; (e) KCA Deutage Offshore ASA; (f) Songa Drilling Pte Ltd.; (g) KCA Deutage Pte Ltd.; (h) Songa Offshore ASA; (i) Songa Offshore AS; (j) Abbott Group, plc.; (k) Joseph F. Archer, P.C.; (l) Joe Archer; (m) Joseph F. Archer, P.C. IOLTA Account; (n) Mehaffy Weber, P.C.; (o) Mehaffy Weber, P.C. IOLTA Account; (p) Ernest W. Boyd; (q) Butch Boyd; (r) Ernest W. Boyd IOLTA Account; (s) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. (t) Chamberlain, Hrdlicka, White, Williams & Martin, P.C. IOLTA Account; (u) Lyman, Twining, Weinberg & Ferrell, P.C.,; (v) Lyman, Twining, Weinberg & Ferrell, P.C. IOLTA Account; (w) Danny Davis; and/or (x) Centurion Gold Holdings, Inc., at one or more of the following institutions:  Bank of America, N.A.; Bank of China; The Bank of New York; Citibank, N.A.; Deutsche Bank Trust Company Americas; HSBC Bank USA, N.A.; JPMorgan Chase Bank, N.A.; UBS AG; Wachovia Bank, N.A.; Société Générale; Standard Chartered Bank; BNP Paribas; Calyon Investment Bank; American Express Bank; Commerzbank; ABN Amro Bank; Bank Leumi USA; Banco Popular; Bank of Tokyo-Mitsubishi UFJ Ltd.; China Trust Bank; Industrial Bank of Korea; Shin Han Bank; Great Eastern Bank; Nara Bank; United Orient Bank; or any other financial institution within the Southern District of New York;

3.      That Escopeta Oil & Gas Corporation and any other person claiming an interest therein may be cited to appear and answer the matters aforesaid;

4.      That judgment be entered in favor of COSCOL (HK) Investment & Development

Co., Ltd. and against Escopeta Oil & Gas Corporation in the amount of $6,935,590.00 (including estimated interest, expenses and attorneys' fees); and,

5.    That this Court grant COSCOL (HK) Investment & Development Co., Ltd. such other and further relief which it may deem just and proper.

Dated: New York, New York
      February 26, 2008

              TOMASELLI & CO.

              By: /s/ John J. Tomaselli
              John J. Tomaselli
              410 Wall Street
              11th Floor, No. 68
              New York, New York 10005
              Tel: (212) 461-4880
              Fax: (212) 214-0318
              *Attorneys for Plaintiff*
              *COSCOL (HK) Investment & Development Co., Ltd.*

9

## VERIFICATION

STATE OF FLORIDA          )

                                :ss.:

COUNTY OF BROWARD       )

JOHN J. TOMASELLI, being duly sworn, deposes and says:

       I am a member of the firm of Tomaselli & Co., counsel for COSCOL (HK) Investment & Development Co., Ltd., plaintiff in the foregoing action. I have read the foregoing Verified First Amended Complaint and know the contents thereof, and the same are true and correct to the best of my knowledge. I have reviewed documentation provided to me by COSCOL (HK) Investment & Development Co., Ltd. and corresponded with COSCOL (HK) Investment & Development Co., Ltd. representatives regarding this matter. I am authorized by COSCOL (HK) Investment & Development Co., Ltd. to make this verification, and the reason for my making it as opposed to an officer or director of COSCOL (HK) Investment & Development Co., Ltd. is that there are none within the jurisdiction of this Honorable Court.

                                    John J. Tomaselli

Sworn to before me this
26th day of February, 2008

Fazia Assad
My Commission DD346058
Expires August 31, 2008

Notary Public

# EXHIBIT 1



| | |
|---|---|
| 1. Place and date of Contract<br>Contract #2219 dated 9th February 2006 Houston, TX USA | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>STANDARD TRANSPORTATION CONTRACT FOR HEAVY AND VOLUMINOUS CARGOES<br>CODE NAME: "HEAVYCON"<br>PART I |
| 2. Owners/place of business (Cl. 2.1.)<br>COSCOL (HK) Investment & Development Co., Limited<br>Room 4002, 40/F, COSCO Tower,<br>183 Queen's Road Central<br>Hong, Kong<br><br>Owners Agents/Place of Business<br>NMA Maritime & Offshore Contractors B.V.<br>Strevelsweg 700, app. 608/ 609<br>3083 AS Rotterdam<br>The Netherlands | 3. Charterers/place of business (Cl. 2.1.)<br>Escopeta Oil & Gas Corporation<br>5005 Riverway, Suite 440<br>Houston, Texas 77056 |
| 4. Vessel (name, type and other particulars; also description of Owners' equipment) (Cl. 2.1. & 4.2.)<br>COSCO semi-submersible vessel "Tai An Kou" - See Appendix II | |
| 5. Cargo (full description of cargo; indicate whether full and complete cargo or part cargo; also state minimum/maximum weight of cargo) (Cl. 2.1. & 10.5.)<br>Songa Tellus MLT 82 SDC Jack Up Rig, always within vessel's capabilities and capacity. Subject cargo details | |
| 6. Loading port(s) (Cl. 2.1.)<br>Sabine Pass, USA<br>1 safe and suitable loading location to be arranged by Charterers | 7. Discharging port(s) and intended route from loading port to discharging port (Cl. 2.1. & 3.2.)<br>Cooks Inlet, USA<br>1 safe and suitable discharging location to be arranged by Charterers |
| 8. Loading method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.3.)<br>4.3 (c) Float-On | 9. Discharging method(s) (indicate alternative(s): (a),(b) or (c), as agreed) (Cl. 4.8.)<br>4.8 (c) Float-Off |
| 10. First layday (Cl. 8.1.)<br>Loading Window 1 - 30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning | 11. Cancelling date (Cl. 8.1.)<br>30th June 2006 |
| 12. Notices for loading to be given to (Cl. 9.1. & 9.2.)<br>Owners to give Charterers 14/7/3/1 days approximate load readiness notice | 13. Notices for discharging (state interval periods and to whom to be given) (Cl. 9.2. & 9.3.)<br>Owners to give Charterers 14/7/3/1 days approximate discharge readiness notice |
| 14. Marine Surveyor(s) and date for transportation approval (Cl. 10.1. & 10.4.)<br>To be nominated by Charterers - Approval within 21 days of Owner's tendering notice of readiness | |
| 15. Freight (Cl. 11)<br>U.S. $4,310,000.00 | 16. Freight and demurrage, etc. payment (currency and where payable; also state owners' bank account) (Cl. 11)<br>Payment of freight and demurrage as per Clause 11, 12, and 13.<br>Payments made to:<br>Rabobank Zeist, 2e Hogeweg 83, 3701 AW Zeist, The Netherlands<br>Swiftcode: RABONL2U<br>Account No: 15.90.82900<br>In Name of:<br>NMA Maritime & Offshore Contractors BV |
| 17. Free time for loading/discharging and canal transit (if applicable) (state total number of running hours) (Cl. 12.1. & 14.1.)<br>24 hours loading SHINC/FHINC<br>24 hours discharging SHINC/FHINC | 18. Demurrage rate per day (Cl. 12.2.)<br>USD 25,000 per day pro rata in port<br>USD 30,000 per day pro rata offshore standby<br>USD 40,000 per day pro rata deviation |
| 19. Mobilisation charge (if agreed, state lump sum amount) (Cl. 13.1.)<br>N/A | 20. Demobilisation charge (if agreed, state lump sum amount) (Cl. 13.2.)<br>N/A |
| 21. Canal transit costs (if any) limited to (Cl. 14.2.)<br>N/A | 22. Price per ton of bunker oil (Cl. 15)<br>USD 300 mt IFO 380 |

EXHIBIT A

Printed by BIMCO's idea

Copyright, published by The Baltic and International Maritime Council (BIMCO)

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

(continued)                    CON   ...NDARD CONTRACT FOR HEAVY AND VOLUMIN.    ...RGOES                    PART I

| | |
|---|---|
| 23. Termination Fee(s) (state amount(s) if agreed) (Cl. 20.1 & 20.2)<br>75% of the Freight in Box 15 | 24. Liability for cargo (state whether Bill of Lading or Cargo Receipt) (Cl. 21.4, or 21.21.5.)<br><br>Cargo Receipt |
| | 25. General average shall be adjusted/settled at (Cl. 25)<br>LONDON |
| 26. Brokerage and to whom payable (Cl. 31) | 27. Law and arbitration (state 32.1, 32.2, or 32.3 of Cl. 32, as agreed; if 32.3 agreed state place of arbitration) (if Box 27 not filled in 32.1 shall apply) (Cl. 32)<br>English Law<br>Arbitration in London |

28. Numbers of additional clauses covering special provisions, if agreed
      Clauses 33, 34, 35, 36, 37,38 and Appendices I, II, III and IV form an integral part of the charter party.

It is mutually agreed that this Contract shall be performed subject  to the conditions contained  in the Contract consisting of PART I including additional clauses, if any agreed and stated in Box 28 and PART II. In the event of a conflict of conditions, the provisions of PART I and any additional clauses shall prevail over those of PART II to the extent of such conflict but no further.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| *[signature]*<br><br>Wu Xiao Ming COSCOL Chief Representative Houston | *[signature]* |

ESCOPEIA_0005682

PART II

"HEAVYCON" Standard Transportation Contract

1. Definitions
In this Contract the following words and expressions shall have the meanings hereby assigned to them.
1.1. "The Owners" shall mean the party identified in Box 2.
1.2. "The Charterers" shall mean the party identified in Box 3.
1.3. "The Vessel" shall mean the transportation unit(s) described in Box 4.
1.4. "Loading port" shall mean the port(s) or area(s) specified in Box 5.
1.5. "Discharging port" shall mean the port(s) or area(s) specified in Box 6.
1.6. "The Cargo" shall mean any goods or equipment or other items described in Box 7.
1.7. "The Transportation" shall mean the carriage of the cargo and, as the case may be, the loading, discharge and all other operations connected therewith.

2. Voyage
2.1. It is agreed between the Owners mentioned in Box 2 and the Charterers mentioned in Box 3 that, subject to the terms and conditions of this Contract, the cargo described in Box 5 shall be transported by the Owners from the loading port(s) mentioned in Box 5, or so near thereunto as she may safely get and lie always safe and afloat, to the discharging port(s) mentioned in Box 7, or so near thereunto as she may safely get and lie always safe and afloat, by means of the Vessel named and described in Box 4 or in an appendix.
2.2. At the commencement of the voyage the Owners shall exercise due diligence in making the Vessel seaworthy. The Owners shall perform the voyage with due despatch unless otherwise agreed.

3. Deviation/Delays/Part Cargo
3.1. The Vessel has the liberty to sail without pilots, to tow and/or assist vessels in all situations, to deviate for the purpose of saving life, to replenish bunkers and/or to deviate for purpose of safety of the cargo, crew, Vessel and for any other reasonable purpose.
3.2. Without prejudice to the provisions of Clause 24, should the Master decide, for the purpose of the safety of the cargo, to deviate from the normal route which is stipulated in Box 7, the Charterers shall pay for all time lost as a consequence of the deviation at the demurrage rate stipulated in Box 15. The time lost shall include all time used until the Vessel reaches the same or equivalent position to that where the deviation commenced and the Charterers shall also pay all additional expenses incurred by such deviation including bunkers, port charges, pilotage, tug boats, agency fees and any other expenses whatsoever incurred.
3.3. If the Vessel for reasons beyond the Owners' control is being delayed at loading port(s) or place(s) and/or discharging port(s) or place(s), including obtaining free pratique, customs, port clearance or other formalities, such delays shall be paid for by the Charterers at the demurrage rate stipulated in Box 15.
3.4. Unless the cargo is described as a full and complete cargo in Box 6, the Owners shall have the liberty of receiving the cargo and discharging and of discharging other part cargo(es) on the account of others than the Charterers from places enroute or not enroute to places enroute enroute to places enroute or not enroute thereto. The mention of loading and discharging places shall be at the Owners' option.
When the Owners exercise such option(s) this shall in no way constitute a deviation notwithstanding anything else contained in this Contract.

4. Loading and Discharging
4.1. The Charterers shall have the cargo in all respects ready for the said voyage at the loading port(s) on the date for which notice of expected load-readiness is given by the Owners as per Clause 5, but not before the date stated in Box 10 as first laytday.
The precise loading area or place within the agreed loading port, which shall be always safe and accessible and suitable for the loading operation shall be nominated by the Charterers upon receipt of the first notice given by the Owners pursuant to Clause 5, always subject to the approval of the Owners and the Master. Such approval shall not be unreasonably withheld and
4.2. The Charterers shall provide the equipment stated in Box 4 or in an appendix and shall in their own time and at their own expense prepare each equipment for the loading. All other equipment shall be provided by the Charterers. Where the cargo has been loaded and positioned, it shall be seafastened and/or lashed by the Owners at their expense to the satisfaction of the Master.
4.3. At the loading port, the cargo shall be delivered by the Charterers without delay in the sequence required by the Master at any time during day or night, Saturdays, Sundays and holidays included and shall be loaded by one or more of the following methods stated in Box 8:
3 (a) If agreed in Box 8 that the Owners shall load the cargo with their own gear or tackle, the Charterers shall bring the cargo alongside within reach of

such loading equipment. The Owners shall procure the necessary labour and/or tackle, either from the crew or from ashore and shall pay for same except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.
3 (b) If agreed in Box 8 that the Charterers shall perform the loading of the cargo shall be placed on board and positioned by the Charterers to the full satisfaction of the Master. The Charterers shall procure and pay for all labour and all necessary equipment other than that stated in Box 4.
3 (c) If agreed in Box 8 that the cargo shall be loaded by means of float-on method, the Charterers shall position the cargo prior to loading at 10 metres or at an agreed distance from the Vessel's submerged deck to the full satisfaction of the Master. The Owners shall attach lines to the cargo and shall position and secure the cargo over the submerged deck by using winches and/or tugs. The Owners shall procure and pay the necessary labour and winchmen either from the crew or from shore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.
The Charterers shall procure and pay for workboats and tugs required for the positioning of the cargo. The Owners shall have the right to use such workboats and tugs for the loading operation reimbursing the Charterers the actual costs for the use thereof from the time the Vessel's float line is attached to the cargo until the time when the last line is released from the cargo and the workboats and tugs are dismissed by the Owners.
3 Indicate alternative(s) (a), (b) or (c), as agreed, in Box 8.
4.4. The precise discharging area or place within the discharging port and which shall be always safe and accessible and suitable for the discharging operation, shall be named by the Charterers well in advance of the Vessel's arrival, always subject to the approval of the Owners. Such approval shall not be unreasonably withheld.
At the discharging port the Charterers shall take delivery of the cargo without delay in accordance with Clause 24, at any time during day or night Saturdays, Sundays and holidays included.
4.5. Prior to actual discharge the Owners shall, unless otherwise agreed, remove all seafastening and/or lashing and prepare the Vessel for the discharge operation. The entire discharge operation always to be done to the full satisfaction of the Master.
4.6. The cargo shall be discharged by one or more of the following methods stated in Box 9:
3 (a) If agreed in Box 9 that the Owners shall discharge the cargo with their own gear or tackle, the Charterers shall take delivery of the cargo upon discharge and within reach of said gear or tackle. The Owners shall procure and pay for necessary winchmen and labour to perform the discharge except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.
3 (b) If agreed in Box 9 that the Charterers shall discharge the cargo, the Charterers shall procure and pay for the necessary equipment and labour for the discharge of the cargo.
3 (c) If agreed in Box 9 that the cargo shall be discharged by means of float-off method, the Owners shall submerge the Vessel and float off the cargo. The Owners shall procure and pay the necessary labour and winchmen either from the crew or from shore except that any shore labour forced upon the Vessel by local or union regulations shall be for the Charterers' account.
The Charterers shall procure and pay for workboats and tugs required for discharging the cargo. The Owners shall have the right to use such workboats and tugs for the discharging operations reimbursing the Charterers the actual cost for the use thereof from the time the first line is attached to the cargo until the time when the last part of the cargo passes the side of the Vessel at which time the Charterers shall take delivery of the cargo.
3 Indicate alternative(s) (a), (b) or (c), as agreed in Box 9.
4.7. All expenses associated with the Vessel such as harbour dues, pilotage, local tug assistance, if required, agency fees, fuel and lubricants shall be paid for by the Owners except as otherwise provided for in this Contract.

5. Permits/Licences
5.1. All necessary permits and/or licences pertaining to the loading and/or discharging operations shall be provided and paid for by the Charterers. The same applies to permits and/or licences pertaining to the carriage of cargo, if required, the Owners shall assist the Charterers in obtaining such permits and/or licences.
5.2. Any delay to the Charterers in obtaining the permits and/or licences related to sub-clause 5.1 shall be at the Charterers' time and any time lost shall be paid for at the demurrage rate stipulated in Box 15.

6. Taxes, Charges, etc.
The Charterers shall pay all duties, taxes and charges whatsoever levied on the cargo and/or the freight at the loading port and/or discharging port inc-

1
2
3
4
5
6
7
8
9
10
11
12
13

14
15
16
17
18
19
20
21
22
23
24
25

26
27
28
29
30
31
32
33
34
35
36
37
38
39
40
41
42
43
44
45
46
47
48
49
50
51

52
53
54
55
56
57
58
59
60
61
62
63
64
65
66
67
68
69
70
71
72
73

74
75
76
77
78
79
80
81
82
83
84
85
86
87
88
89
90
91
92
93
94
95
96
97
98
99
100
101
102
103
104
105
106
107
108
109
110
111
112
113
114
115
116
117
118
119
120
121
122
123
124
125
126
127
128
129
130
131
132
133
134
135
136

137
138
139
140
141
142
143
144
145

146
147
148

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPEIA_0005683

PART II
"HEAVYCON" Standard Transportation Contract

spective of how the amount thereof may be assessed, including agency commission assessed on the basis of the freight. 149 150

**7. Quarantine**
Unless due to health conditions on board the Vessel, any time lost as a result of quarantine formalities and/or health restrictions imposed or incurred at any stage of the voyage, including any such loss of time at the loading port and/or the discharging port, shall be paid for by the Charterers at the demurrage rate specified in Box 18. The Charterers shall also pay for all other expenses which may be incurred as a result thereof. 151 152 153 154 155 156 157

**8. Commencement of Loading/Cancelling Date**
8.1. The date of commencement of the loading shall be at any time on or between the dates mentioned first by day stated in Box 10 and the cancelling date stated in Box. 158 159 160

8.1, both dates inclusive, in the Owners option. Should the Owners give notice of readiness prior to the first by day, the Charterers may, at their option accept such an earlier loading date and the time used shall count against the time lines as per Clause 12. 161 162 163 164

8.2. Should it clearly appear that the Vessel will not be ready to commence the loading latest on the cancelling date the Owners shall immediately notify the Charterers hereof and state a new cancelling date as soon as they are in a position to state with reasonable certainty such new cancelling date. 165 166 167 168

Within 72 running hours after receipt of the Owners' notice as aforesaid and latest when the Vessel is ready for loading, whichever is the earlier, the Charterers shall advise the Owners whether they elect to cancel this Contract, failing such advice the new cancelling date as notified by the Owners shall apply. 169 170 171 172 173

8.3. Should the Charterers cancel the Contract according to sub-clause 8.2., any amount paid to the Owners in advance and not earned shall be returned to the Charterers by the Owners unless the delay was caused by Salpem Ltd in the stable project in which case the termination fee stated in Box 23 shall be paid by Charterer to Owners. 174 175 176

8.4. The Owners shall not be responsible for any loss or damages whatsoever incurred by the Charterers as a result of the Charterers cancelling this Contract as per sub-clause 8.2 nor shall the Charterers be responsible for any loss of damages whatsoever suffered by the Charterers as a result of the failure of the Vessel to be ready for loading latest on the last date of the loading window/cancelling date 177 178 179 180 181

agreed in Box 10 as the case that a new cancelling date has been agreed. 182
8.5. Should the cargo for reasons beyond the Owners' control not be loaded within 14 days from tendering of notice of readiness, the Owners shall have the option to cancel this Contract. 183 184 185

If the Owners exercise their option to cancel the Contract in accordance with this sub-clause, the Charterers shall pay to the Owners the applicable termination fee according to Clause 20 in addition to any demurrage incurred. 186 187 188 189

**9. Notices**
9.1. Advance Notices of Expected Loading/Discharge
The Owners shall give notices as per Box 12 of the expected day of the Vessel's readiness to load 14 (fourteen) days, 7 (seven) days and 3 (three) days in advance. Furthermore, the Owners shall give 24 (twenty four) hours approximate notice of the expected hour of the Vessel's readiness to load. 190 191 192 193 194 195

9.2. Notice of Readiness
The Owners shall give notice of readiness by letter, cable, telex or telephone as per Box 13 advising when the Vessel is ready to commence loading at the loading port and when the Vessel is ready to commence discharge at the discharging port as per Box 13. All notices may be given at any time of the day, Fridays, Saturdays, Sundays and holidays included and notwithstanding hindrances as referred to in Clause 9.3. 196 197 198 199 200 201 202

9.3. During the voyage the Owners shall give notice of expected time of arrival at discharging port(s) with intervals of the number of days stipulated in Box 13. 203 204 205

**10. Marine Surveyor/Condition of the Vessel and Cargo**
10.1. The Marine Surveyor(s) stated in Box 14 will be appointed for this transportation. If Box 14 has not been filled in the Charterers and the Owners shall agree on the appointment of Marine Surveyor(s) acceptable to the cargo underwriters. 206 207 208 209 210

10.2. All relevant documentation required by the Marine Surveyor(s) for their approval of the transportation shall be submitted to the Marine Surveyor at the earliest possible stage after the Contract is made. If and when all submitted earlier. As soon as possible after submission of the relevant documentation, transportation approval shall be given by the Marine Surveyor. The Charterers shall pay all expenses relating to the production of documentation related to the cargo and/or the Charterers' equipment. The Own- 211 212 213 214 215 216 217

ers shall pay all expenses relating to documentation related to the Vessel and all other equipment being provided by the Owners in the performance of the transportation. 218 219 220

10.3. The Charterers shall arrange and pay for all the Marine Surveyor(s) services, including their approval of the transportation. 221 222

10.4. Should the Marine Surveyor(s) not give transportation approval within 21 days of Owners' tendering notice of readiness approval by the date stipulated in Box 11, both the Charterers and the Owners may elect to terminate this Contract and all freight paid for advanced by the Charterers to the Owners shall be promptly refunded unless such approval was withheld because of circumstances beyond Owner's reasonable control and responsibilities. 223 224 225 226

10.5. The Charterers warrant that the full description of the cargo mentioned in Box 5 is correct and further warrant that the cargo is in all respects tight, staunch, strong and in every way fit for the transportation. Should the cargo and/or its description not be in compliance with the above said item the Owners shall have the option to cancel this Contract. If the Owners exercise their option to cancel the Contract in accordance with this Clause the Charterers shall pay to the Owners the applicable termination fee according to the provisions of Clause 20. 227 228 229 230 231 232 233 234

**11. Freight**
The freight stipulated in Box 15 shall be paid in instalments as per Box 185 and clause 33 follows-40% upon signing of this Contract and the balance shall be fully prepaid upon completion of loading against surrender of the Cargo Receipt or Bill-of-Lading whichever the case may be. The freight shall be considered earned upon completion of loading and shall be non-returnable whether the Vessel and/or cargo is lost or not lost and whether lost due to perils of the sea or howsoever. The freight instalments shall be paid discountless and be telegraphically remitted in the currency and paid into the Owners' bank account stipulated in Box 18. 235 236 237 238 239 240 241 242 243 244

**12. Free Time/Demurrage**
12.1. The Charterers are allowed the free time stipulated in Box 17 in the loading and discharging port(s) and for actual transit if applicable. Fridays, Saturdays, Sundays and holidays included. 145 146 147 148

The free time at the loading port(s) shall start counting 6 running hours after notice of readiness has been tendered in accordance with Clause 9.2., whether in berth or not, unless loading has commenced earlier and shall count until the first of the Vessel's items is lifted to the cargo transporting deck above the submerged deck. In all respects fully maintained on board the Vessel and approved by the Marine Surveyor(s). 149 150 151 152

The free time at the discharging port(s) shall start counting 6 running hours after notice of readiness has been tendered in accordance with Clause 9.2., whether in berth or not, unless discharge has commenced earlier and shall count until the cargo is discharged and afloat approximately 50 meters off the Vessel in all respects removed from the Vessel. 253 254 255 256 257

If the Owners are to load and discharge the cargo in accordance with Clauses 4.2. (a) or (c) and 4.6. (a) or (c) free time or time on demurrage shall not count for time used for the actual loading and discharge operation in excess of the fixed hours stipulated in Box 17 or Part I, unless such time used is in excess of the fixed time is due to reason beyond the Owners' control. 258 259 260 261 262

12.2. Demurrage shall be payable for all time used in excess of the free time. 263 The demurrage rate for the Vessel is the amount stipulated in Box 18 calculated per day or pro rata for part of a day. 264

12.3. Free time shall not count and if the Vessel is on demurrage, demurrage shall not accrue for time lost by reason of strike or lockout of the Master, officers or crew or by reason of breakdown of the Vessel or the Owners' equipment. 265 266 267 268 269

12.4. The demurrage and/or other amounts which are calculated at the demurrage rate fall due and are payable by the Charterers immediately upon presentation of the Owners' invoice to the Charterers' bank account stipulated in Box 18. 270 271 272 273

Should more than 14 days of demurrage have accrued, the Owners are entitled to demurrage on account. The Owners may demand payment against presentation of invoices covering the first 14 days and thereafter for every 7 days. 274 275 276 277

**13. Modification/Demobilization**
13.1. Modification
It agreed upon in Box 19 the Charterers shall pay the lump sum stipulated herein in respect of mobilization which amount shall be earned and non-returnable upon the Vessel's arrival in the loading port. 278 279 280 281 282

13.2. Demobilization 283

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text if this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.



PART II
"HEAVYCON" Standard Transportation Contract

14. Canal Transit

15. Bunker Escalation

16. Ice

17. Dangerous Cargo

18. Lien

19. Substitution

20. Termination

21. Liability for Cargo - Bill of Lading or Cargo Receipt



This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible, in the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

ESCOPEIA_0005686

PART II
"HEAVYCON" Standard Transportation Contract

26.4. Discharging port...

26.5. Notification...

27. War Risks

27.1. In these clauses "War Risks" shall include any blockade or any action which is unassigned as a blockade by any Government or by any belligerent or by any organized body, sabotage, piracy, and any actual or threatened war, hostilities, warlike operations, civil war, civil commotion, or revolution.

27.2. If at any time before the Vessel commences loading, it appears that performance of the Contract will subject the Vessel or her Master and crew or her cargo to war risks at any stage of the adventure, the Owners shall be entitled by letter or telegram despatched to the Charterers, to cancel this Contract.

27.3. The Master shall not be required to load cargo or to continue loading or to proceed on or to sign Bill(s) of Lading for any adventure on which or any port at which it appears that the Vessel, her Master and crew or her cargo will be subjected to war risks. In the event of the exercise by the Master of his right under this Clause after part or full cargo has been loaded, the Master shall be at liberty either to discharge such cargo at the loading port or to proceed therewith...

27.4. If at the time the Master elects to proceed with part or full cargo under sub-clause 27.3, or after the Vessel has left the loading port, or the last of the loading ports, it appears that...

27.5.(a) The Vessel shall have liberty to comply with any directions or recommendations as to loading, departure, arrival, routes, ports of call, stoppages, destination, zones, waters, discharge, delivery or in any other wise whatsoever (including any direction or recommendation not to go to the port of destination or to delay proceeding thereto or to proceed to some other port) given by any Government or by any belligerent or by any organized body engaged in civil war, hostilities or warlike operations or by any person or body acting or purporting to act as or with the authority of any Government or belligerent or of any such organized body or by any committee or person having control over the insurance on the Vessel, the right to give any such directions or recommendations. If, by reason of or in compliance with any such direction or recommendation, anything is done or is not done, such shall not be deemed a deviation.

(a) If, by reason of or in compliance with any such directions or recommendations, the Vessel does not proceed to the port or ports named in the Bill(s) of Lading or to which she may have been ordered pursuant thereto, the Vessel may proceed to any port as directed or recommended or to any safe port which the Owners in their discretion may decide on and there discharge the cargo. Such discharge shall be deemed to be due fulfilment of the Contract and the Owners shall be entitled to freight as if discharge had been effected at the port or ports named in the Bill(s) of Lading or to which the Vessel may have been ordered pursuant thereto.

27.6. All extra expenses including extra war risks insurance costs incurred in performance of the transportation and discharging of the cargo at the loading port or in reaching or discharging the cargo at any port as provided in sub-clauses 27.4. and 27.5.(a) of this Clause shall be paid by the Charterers, and the Owners shall have a lien on the cargo for all sums due under this Clause.

28. Limitation of Liability

Any provisions of this Contract to the contrary notwithstanding, the Owners shall have the benefit of all limitations of, and exemptions from, liability accorded to the Owners or Chartered Owners of vessels by any applicable statute or rule of law for the time being in force, and the same benefits to apply regardless of the form of signatures given to this Contract.

29. Interest

If any amounts due under this Contract are not paid when due, then interest at the rate of 1.5% per month or pro rata for part of a month shall be paid on all such amounts until payment is received.

30. Agency

Vessel shall be addressed to Owners' agents at port(s) of loading and discharging.

31. Brokerage

The Owners shall pay a brokerage at the rate stated in Box 26 to the Broker(s) mentioned in Box 26 on any freight, demurrage, and mobilization fee, demobilization fee and/or termination fee paid under this Contract. If the full amounts as aforesaid are not paid owing to breach of this Contract, by either of the parties, the party liable thereto shall indemnify the Broker(s) against his or their loss of brokerage.

32. Law and Arbitration

32.1. If agreed and stated in Box 27, this Contract shall be governed by English law and any dispute arising out of this Contract or Cargo Receipt or any non-negotiable bill of lading or Bill of Lading issued thereunder shall be referred to arbitration in London, one arbitrator being appointed by each party, in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single Arbitrator appointed shall apply. If two Arbitrators properly appointed shall not agree they shall appoint an umpire whose decision shall be final.

32.2. If agreed and stated in Box 28, this Contract shall be governed by U.S. law and any disputes arising out of this Contract or any Bill of Lading issued thereunder shall be referred to arbitration at New York in the following manner:

32.3. If agreed and stated in Box 27, any disputes arising out of this Contract or any Bill of Lading issued thereunder shall be referred to arbitration at the place indicated in Box 27, subject to the law and procedures applicable there.

32.4. If Box 27 is not filled in sub-clause 32.1 of this Clause shall apply.

This document is a computer generated HEAVYCON form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

### Additional Clauses:

Referring to this contract no 2219 dated 9th February 2006 between Escopeta Oil & Gas Corporation, herewith referred to as Charterers and COSCO Shipping Company Limited, herewith referred to as Owners, the following has been agreed:

**Clause 33: Freight Payment**

The freight is payable as follows:

10% ten (10) banking days after signing the contract
40% five (5) banking days after the arrival at loading location
50% five (5) banking days prior arrival at discharge location before releasing the cargo receipt

Should the entire freight from Charterer's bank not have been received by Owners in time the Owners will have the right to postpone the discharge operation, standing-by, which time will be charged at the demurrage rate until the moment the freight has been received by Owners

**Clause 34: Transit Time**
Expected transit time given by owners for information purposes only: 48 days weather delay, engine breakdown, force majeure, Act of God, and sailing restriction(s) imposed by the nominated marine warranty surveyor excluded.

**Clause 35: Aft Bouyancy Casings**
The standard position of the buoyancy casings is in the aft position for float-on/float-off operations. Should charterers require the aft bouyancy casing to be shifted then time and cost to be for charterers account.

**Clause 36: Daily Position Reports**
Owners to provide Charterers with daily weather and voyage reports.

**Clause 37: Jones Act**
All Jones Act issues shall be addressed and sole reposibility of the Charterers. If any Jones Act issues arrise, Charterers agree to discharge the Cargo in Canada or other port agreed upon by Owners and Charterers. Deviation, if any, to be for Charterers time and account

**Clause 38: Management approval**
This contract is subject to Charterers management approval by which must be given in writing to Owners no later than Wednesday, February 15th at 17:00 hours.

DSD

ESCOPETA_0005688

# EXHIBIT 2

ADDENDUM NO 1

TO

TRANSPORTATION CONTRACT

DATED

9 FEBRUARY 2006

BETWEEN

COSCO SHIPPING COMPANY LIMITED ("THE OWNERS")

AND

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract the Parties have today agreed as follows:

1. Box 7 Discharging port(s) and intended route from loading to discharge port – The Parties have agreed that the route between Sabine Pass, USA and Cooks Inlet, USA (subject Jones Act issue referred to in Clause 37 of contract) will be via the Cape of Good Hope.
2. Box 15 Freight – The Parties have agreed that the freight will be increased to USD 54,710,000.00.

All other terms and conditions of the above mentioned Contract to remain unchanged.

Houston
7 April 2006

_____
Cosco Shipping Company Limited

_____
Escopeta Oil & Gas Corporation
4/25/06

ESCOPETA_0005680

# EXHIBIT 3

Addendum #4 to BIMCO Heavycon contract #2219

DATED 9th February 2006

between

COSCO (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD ("THE OWNERS")

And

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract, the Parties have today agreed as follows:

1) Change Box 10 (First Layday) – Delete "Loading window 1 – 30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning" and Add "Loading Window November 15, 2006 – December 1, 2006."

2) Change Box 11 (Cancelling date) – Delete "30th June 2006" and add "December 1, 2006"

3) Change Box 15 – Delete "U.S. $4,310,000.00" and add "U.S. $5,310,000.00 via Magellan Straights or U.S. $5,710,000.00 via Cape of Good Hope to be declared by September 15, 2006"

4) Change Box 23 – Delete "75% of Freight in Box 15" and add "U.S. $1,482,500.00 if via Magellan Straights or U.S. $1,782,500.00 via Cape of Good Hope.

5) Change Box 28 – Delete "38" and Add "; 39" after "37"

6) Change Section 8.2 Line 176 – Delete "unless the delay was caused by Saipem UK in the Sable Project in which case the termination fee stated in Box 23 shall be paid by Charterers to Owners"

7) Delete Clause 38

8) Add Clause 39: Postponement & Demurrage Fee

A postponement fee of U.S. $2,500,000.00 and demurrage fee of U.S. $125,000.00 (U.S. $25,000.00 x 5 days) must be paid in full, less the U.S. $431,000.00 already paid, to Owners by September 15, 2006. These fees are in addition to the freight mentioned in item 3 above.

9) Total amount due paid in full to COSCO. by September 15, 2006 will be USD 2,725,000.00. Any dollar amount not paid by September 15, 2006 will be subject to interest terms per clause 29 of the contract.

$   2,500,000.00   (postponement fee)
+   125,000.00   (5 days demurrage)
+   431,000.00   (10% down on original freight)
+   531,000.00   (10% of new agreed upon freight)
  USD 2,725,000.00

The remaining freight of USD $4,779,000.00 basis Magellan Straights or USD $5,179,000.00 basis Cape of Good Hope will be paid as per original payment terms included in clause 33 of the contract.

10) Change "THE OWNERS" to COSCO1 (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD on addendums 1 & 2.

11) Delete Addendum #3

All other terms and conditions of the above mentioned Contract and Addendums No. 1 and 2 to remain unchanged.

Houston July 21, 2006

COSCO (HK) Investment & Development Co., LTD. ("Owners")

ESCOPETA OIL & GAS CORPORATION ("Charterers")

# EXHIBIT 4

Addendum #5 to BIMCO Heavycon contract #2219

DATED 9th February 2006

Between

COSCOL (HONG KONG) INVESTMENT & DEVELOPMENT CO., LTD ("THE OWNERS")

And

ESCOPETA OIL & GAS CORPORATION ("THE CHARTERERS")

With reference to the above mentioned Contract, the Parties have today agreed as follows:

1) Delete Item 1 of Addendum #4.

2) Change Box 10 (First Layday) – Delete "Loading window 1 – 30 June 2006 as soon as reasonably possible directly after the Sable Transport deck cleaning" and Add "Loading Window April 1, 2007 – Apr 30, 2007. "

3) Delete Item 2 of Addendum #4.

4) Change Box 11 (Cancelling date) – Delete "30th June 2006" and add "April 30, 2007".

5) Change Item 3 of Addendum #4 – Delete "September 15, 2006" and Add "November 15, 2006".

6) Change Box 23 – Add ", 40" after "25".

7) Add Clause 40: Mobilization Fee
   A. Mobilization fee of U.S. $4,150,000.00, to cover expenses involved with mobilizing ship from the Gulf of Mexico to Yantal, will be paid in full to Owners by October 20, 2006.  This fee is in addition to the freight in Box 15, postponement fee plus interest, and demurrage already owed to Owners.

8) Delete Item 9 of Addendum #4.

9) Total amount due paid in full by Charterers to Owners by October 20, 2006 is USD 4,915,875.00.  If the total amount is not paid by October 20, 2006, Owners have the option to terminate the contract.
   $     2,725,000.00     (as per Item 9 of Addendum #4)
   +     2,150,000.00     (Mobilization Fee)
   +        40,875.00     (1 month interest at 1½% per month of USD 2,725,000.00)
   USD 4,915,875.00

   The remaining freight of USD $4,770,000.00 basis Magellan Straights or USD $3,170,000 basis Cape of Good Hope will be paid as per original payment terms included in clause 37 of the contract.

All other terms and conditions of the above mentioned Contract and Addendums No. 1, 2, and 4 to remain in effect.

Houston, October 11, 2006

COSCOL (HK) Investment & Development Co., LTD ("Owners")

ESCOPETA OIL & GAS CORPORATION ("Charterers")